Ludwig **BLAHA** et al.

v.

The **UNITED STATES.**

No. 241–73.

United States Court of Claims.

Feb. 19, 1975.

Stanley B. Gruber, New York City, for plaintiff. Abraham E. Freedman, New York City, attorney of record.

Marc J. Fink, with whom was Asst. Atty. Gen. Carla A. Hills, for defendant. Paul A. Zoss, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and KUNZIG, Judges.

ON DEFENDANT'S MOTION AND PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT.

NICHOLS, Judge:

Plaintiff seamen are members of the National Maritime Union of America (NMU) employed as unlicensed vessel employees of the National Oceanic and Atmospheric Administration (NOA), National Ocean Survey (NOS), Department of Commerce. This suit pits the Commerce Department against the NMU and the Navy Department, on the issue of whether 5 U.S.C. § 5348 requires the Commerce Department to pay a wage increase (denominated a "monthly leave supplement") already agreed to by the NMU, the commercial operators, and the Navy. We have jurisdiction under 28 U.S.C. § 1491. Amell v. United States, 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445 (1966), [Amell I]. We hold that on the peculiar facts and circumstances of this case the Commerce Department is required to pay the same wage increase as approved previously by the Navy for the reasons given below.

The wage agreement that is the cause of the dispute was originally effective between the NMU and the East Coast commercial shipowners on June 16, 1972. It provided, *inter alia*, as follows:

a) Seamen whose base monthly wages are $515.35 or less for the contract year effective June 16, 1972, shall have added to their base monthly wages for the purpose of computing vacation pay, $15.00 per month for work performed for the period from June 16, 1972 to June 15, 1973; $30.00 per month for work performed for the period June 16, 1973 to June 15, 1974 and $45.00 per month for work performed after June 16, 1974.

b) Seamen whose base monthly wages are between $515.36 and $631.53 for the contract year effective June 16, 1972, shall have added to their base monthly wages for the purposes of computing vacation pay, $25.00 per month for work performed for the period from June 16, 1972 to June 15, 1973; $50.00 per month for work performed for the period from June 16, 1973 to June 15, 1974 and $75.00 per month for work performed after June 16, 1974.

c) Seamen whose base monthly wages are over $631.53 for the contract year effective June 16, 1972, shall have added to their base monthly wages for the purposes of computing vacation pay, $35.00 per month for work performed for the period from June 16, 1972 to June 15, 1973; $70.00 per month for work performed from June 16, 1973 to June 15, 1974 and $105.00 per month for work performed after June 16, 1974.

As is well known, commercial vessels are kept moving and spend considerable amounts of time at sea. The necessary posts on board must be manned day and night and throughout the week. Accordingly, the "base" wage for a 40-hour week has no reality in relation to the normal earnings of the seaman, which comprise the base pay plus, for watch standers, a normal and predictible amount of overtime which from the management point of view, is unavoidable, however economically it desires to operate the ship. Vacation pay consisting of "base" pay only would put the seaman in a lower earning level during his vacation period and it is the object of the quoted agreement to diminish the impact of this, without eliminating it entirely.

The Navy's Military Sealift Command (MSC), in October 1972, agreed to pay the same wage increase, specified in the contract above, retroactively to June 16, 1972, with respect to Government owned, civilian manned vessels operating in the NMU Atlantic area.

However, NOA refused to pay the supplement (about $31,000 annually for approximately 468 NOS seamen) in any area. The Commerce Department approved this decision in a letter of the Director of Personnel on March 12, 1974. The problem does not occur with respect to Pacific operations for a reason that will appear.

Plaintiffs subsequently brought this suit as an apparent test case under 5 U.S.C. § 5348 (Supp. II, 1972), and 28 U.S.C. § 1491, alleging a non-discretionary duty on the part of the Secretary of Commerce to pay the prevailing commercial rates or, in the alternative, an abuse of discretion in refusing to pay the prevailing commercial rates.

I

Section 5348 (formerly Section 5342, prior to Pub.L. 92–392, § 1(a), August 19, 1972, 86 Stat. 572), provides as follows:

§ 5348.  Crews of vessels

(a) Except as provided by subsections (b) and (c) of this section, the pay of officers and members of crews of vessels excepted from chapter 51 of this title by section 5102(c)(8) of this title shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry.

(b) Vessel employees of the Panama Canal Company may be paid in accordance with the wage practices of the maritime industry.

\*       \*       \*       \*       \*       \*

The operative words of Section 5348:

\* \* \* shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry,
\* \* \*

have remained unchanged since their enactment as part of the Classification Act of 1949, Pub.L. 81–429.

The legislative history under the 1949 Act is very brief on this section:

The major prevailing-rate groups excluded from the bill are those mentioned in paragraphs (7), (8), and (9) of section 202. These are the trades, crafts, and labor employees, and officers and members of crews of vessels. (U.S.Code Cong. Serv., 81st Cong., 1st Sess., 1949, at 2368).

The legislative history under the 1972 amendments is equally brief:

*Crews of vessels*

Section 5347 is a restatement of existing law relating to crews of vessels of the United States who are paid in accordance with practices of the maritime industry. However section 5347(*b*) has been amended to make vessel employees of Panama Canal Company subject to wage practices of the maritime industry and not merely authorize such pay, as is the case under existing law. (U.S.Code Cong. & Admin.News, 92d Cong., 2d Sess., 1972, at 2985).

However, the Navy provides considerable additional background into the statute and its operation. *See*, Appendix One to this opinion. Counsel for defendant has annexed this Navy statement to his brief, following a policy which we believe is of long standing and commendable, to allow a Department to advise the court of its position when that is contrary to the one the Attorney General has decided to take. Another time, it might be better for the agency statement to be signed and dated. The one we have here affords ample internal evidence of its authority and authenticity, and we rely on it heavily for its history of operation under the statute *to be construed.*

II

This is not the first time that this statute has been before the court. In Benevento v. United States, 461 F.2d 1316, 198 Ct.Cl. 772, cert. denied, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 486 (1972); Beatteay v. United States, 198 Ct.Cl. 989 (1972); Benham v. United States, 198 Ct.Cl. 990 (1972); Daniels v. United States, 407 F.2d 1345, 187 Ct.Cl. 38 (1969); and Amell v. United States, 390 F.2d 880, 182 Ct.Cl. 604, cert. denied, 393 U.S. 852, 89 S.Ct. 88, 21 L.Ed.2d 122 (1968), [Amell II], the broad Government discretion in fixing pay under Section 5348 was repeatedly upheld against seamen's challenges. These cases, except the last, involved the selection of the segment of the maritime industry to be treated as the model for comparison.

Counsel for defendant suggested in oral argument a difference between Commerce Department and Navy vessels in that the former spent more time in port, relatively, when night and day, week in and week out, watch standing was not required. This, if true, might make a difference, but must be disregarded here for lack of documentary substantiation, and because it is not shown to have caused or been relevant to the difference in the position of the two agencies, as stated by their own representatives.

The Navy in Appendix One asserts that seamen on both coasts work normal 56-hour weeks if they are "watch standers" as opposed to "day workers." However, despite similar working conditions, different terminologies and contracts have been used by the West Coast and East Coast unions. On the West Coast, pay rates are negotiated on the basis of a 56-hour week, and leave is paid accordingly. The East Coast, for unexplained reasons, adheres to the conception used for shoreside jobs, describing the 56-hour normal work week for seamen in terms of 40-hours "straight time" and 16-hours "overtime". The effect of this variation in terminology was that until the 1972 contract, East Coast seamen received less vacation pay than West Coast seamen, for similar jobs with otherwise similar take-home pay. The former having their vacation pay computed on the basis of 40-hours weekly pay; the latter on the basis of a 56-hours weekly pay, that absorbed the overtime premium and distributed it over all the hours worked. The wage supplement granted the seamen on the

East Coast by the contract helps realign their pay to be more nearly compatible with what West Coast seamen are paid for vacation pay. Both Government and commercial seamen take paid vacations of substantial length.

The Commerce Department does not tender any substantial issue as to relevant fact. It does not dispute the detailed submission by the Navy and by the NMU. It makes a semantic argument as to the statutes, which we have some difficulty in following, but will do our best to state. It seems to say that as used in Federal personnel law, "pay" means "base pay," whereas a broader term is required when Congress alludes to overtime, night and holiday differentials, etc. See 5 U.S.C. § 6301 and ff. (leave); 5 U.S.C. § 5544 (Wage Board overtime). The statutory leave for seamen "on extended voyages" is two days for each thirty days "of that service", 5 U.S.C. § 6305, plus regular leave accrual under § 6303. The inference seems to be that since the number of days on leave are fixed by statute, not by collective bargaining, the compensation per day must be statutory also, and the statute in default of express provisions, by implication selects the base pay as the statutory vacation rate.

NMU points to specific practice where NOA has paid for overtime hours less than § 5544 would require, although that section tells exactly how overtime pay shall be calculated in relation to base pay. By its own terms it does not apply to § 5348 employees. See below. On the other hand, NOA pays for non-overtime Sunday work, a bargained rate, better than § 5544 and § 5546 would require, 50% instead of 25% over base pay. It would appear, therefore, that Commerce has regarded "pay" under § 5348 as more than "base pay", and we are given no clear consistent statement as to just what the "pay" under § 5348 does and does not include. We suggest the Commerce view that vacation pay is base pay only, really arises because that is what they are used to in the shoreside environment, and the semantics are but later rationalizations.

We think Congress meant to authorize Government agencies owning and operating ships, with civilian crews, to adopt private industry pay practices in their totality, as to differentials, overtime, premiums, or any other general pay practice that entered into and became a part of the seaman's take-home pay, subject of course to the "public interest" exception to be discussed presently. A partial and selective adoption of some but not all of such practices simply does not make sense with reference to any objective the Congress could conceivably have been seeking to achieve. Adoption of the base pay alone, or the base pay plus regular overtime, would be worthless, because these terms have meaning, and are counters used in bargaining, in the relationship they bear to all the factors in the equation. Bargainers may accept a detriment in one part of the pay package in exchange for a benefit in another, *i. e.,* they may take better premium pay for poorer base pay, or the reverse, as apparently happened in the Pacific. Interpretation of the statute to hold the seamen are bound by the concessions they made but don't get the bonuses they bargained for, is not likely to obtain industrial peace on the sea lanes, or further any other purpose.

Commerce's position is a classic instance of saying to Congress: "We see what you mean but you haven't used the correct words to bring it about." As we said in Anderson v. United States, 490 F.2d 921, 925, 203 Ct.Cl. 412, 420, cert. denied, 419 U.S. 827, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974):

> \* \* \* In statutory construction, unless the language is compelling, as it signally here is not, it is well to avoid interpretations no one can believe the Congress could have intended.

*Amell* [II], *supra,* is not to the contrary. Union members had voted to put all of a bargained pay increase into their pension fund. The nearest Government equivalent, its retirement system, was outside the reach of § 5348, and we held the Government ship operating agencies were not required to pay the increase

directly to the seamen. We considered that fringe benefits outside of take-home pay were not "compensation." In this instance the construction of a perfect equivalent to industry practice is of course frustrated, but that does not warrant further and more extensive frustration imposed by semantic limitations upon the ordinary meaning of a simple word like "pay."

We note also that § 5348 requires the pay involved to accord with "prevailing rates and practices in the maritime industry." The Commerce view does not account for the word "practices" and allows it to add nothing to "rates."

Further the *Benevento, Beatteay* and *Benham* cases, *supra*, which affirmed the Interior Department in using a pay scale that obtained in the fishing industry with no premium pay for overtime whatever, undercut the Commerce Department's attempt to limit the application of § 5348 to base pay. By these cases § 5348 is also the source of any overtime rights the seamen have.

### III

The Commerce Department's main position, that it would be illegal for it to pay the vacation pay supplement here involved, would, if right, require the conclusion that the Navy is illegally paying the same supplement, absent any showing of relevant differences. Government counsel conceded this. To us, however, the Navy position appears to be a good faith effort to effectuate the policy of the statute, based on an informed and reasoned analysis of the underlying facts. If not the only possible position, it is at any rate well within the scope of discretion which, as our decisions recognize, the statute contemplates the employing agencies will exercise, not only as to the exclusion of practices it is not "consistent with the public interest" to conform to, but as to other questions as well. *E. g.*, Daniels v. United States, *supra*. Commerce's main position must be rejected.

### IV

The Commerce Department retreat position is that it has determined the payment is inconsistent with the public interest "on several counts." It asserts, in effect, it has discretion and chooses to exercise it in a direction opposite to that of the Navy. This is perhaps only a little less cavalier towards a sister agency with longer experience with the kind of claim we have here, and greater involvement with it. Commerce says that use of two levels of "base pay" fouls up the computation of Government fringe benefits and various forms of employee contributions, *i. e.*, deductions. Moreover, Commerce anticipates its acquiescence in paying the supplement would set a bad precedent for acquiescence in future agreements that may have an impact on Federal employee benefits, although industry practices may not be consonant. Moreover, it is asserted that commercial crewmen are required to use their leave, whereas for Government employees it is for the most part optional.

With regard to the last argument, we suppose if a Commerce Department seaman refuses to take leave, though his services are for the time not needed, he is at any rate hardly likely to be ordered to work overtime. He will, therefore, lose take-home pay and need the supplement just as much as his commercial counterpart.

The Congress in enacting § 5348 recognized the unique character of the pay practices in the maritime industry. It saw that the pay practices existing shoreside with respect to Government employees would be a Procrustes bed if applied to Government vessels and to civilians employed as seamen thereon, union members doing the same work as their commercial counterparts. Its solution was to authorize pay practices to conform "as nearly as is consistent with the public interest", not to Government shoreside practice, but to private industry practice afloat:

> * * * While it is common to defer to agency expertise in many mat-

ters, the agency charged with administering a statute may not adopt a position inconsistent with the enabling statute. * * * [Citing cases.] Farrell Lines, Inc. v. United States, 499 F.2d 587, 602, 204 Ct.Cl. 482, 506 (1974).

Commerce manages to create present conflicts between its pay practices and others in three directions: (a) between Commerce and Navy civilian seamen, (b) between Commerce and commercial seamen, and (c) apparently, though the point is not developed in the record, between Commerce's own seamen on the East and West Coasts respectively. (We have shown that the involved supplement is needed to equalize Atlantic and Pacific vacation pay.)

We think the "public interest" exception was written to provide flexibility needed to eliminate anomalies and inequities that might arise from a too literal conformity to industry pay practices. It was not written to authorize a complete frustration of the Congressional scheme. Since Commerce relies so heavily on the imaginary horrible, let us too suggest one: if Commerce can do what it has done with the relatively minor vacation supplement, it can refuse to apply § 5348 in any part, declaring the entire wage scheme resulting from collective bargaining not to be "consistent with the public interest."

This case has much in common with American Export Isbrandtsen Lines, Inc. v. United States, 499 F.2d 552, 583, 204 Ct.Cl. 424, 476 (1974), in which we held that the Maritime Administration, Department of Commerce, abused its discretion in refusing to include in allowable labor costs for subsidy purposes, certain so-called "severance pay" that was called for by a collective bargaining agreement similar to the one at bar. We quoted from the First Circuit as follows:

> The process of collective bargaining involves a give-and-take, with one party making a concession on one subject in return for obtaining a concession on another subject. It is difficult, if not

impossible, for the parties to make a meaningful judgment as to the kind of bargain they are negotiating if one or more of the key provisions on which agreement turns is subject to invalidation by the Commission. * * *

In view of this factor, we viewed the disallowance as an abuse of discretion in the absence of valid reasons that could be urged in its support.

Conflict with determinations of other agencies is a factor to be considered in review of agency determinations. *Farrell Lines, Inc., supra.*

NOA issued a wage schedule on November 1, 1972, with retroactive effect to June 16, 1972. This was apparently its initial reaction to the new collective bargaining agreement of that date. On November 1, the Navy had already agreed to the vacation pay supplement. Counsel for defendant urges here that the first agency to act, perhaps precipitately, ought not to be able to bind the whole Government. We may agree with this, and yet hold the more dilatory agency may be required, to avoid abuse of discretion, to resolve the difference by discussion, or else obtain the decision of a common superior. If it just arbitrarily chooses to go a different way, the onus of abuse of discretion falls on it.

We should not be read as holding that there would have been no abuse of discretion if the Navy had taken the line that NOA subsequently did. Nor do we hold the contrary. The case is not before us and we express no opinion.

Commerce alleged nothing in its decision in support of its position on "public interest" that was not equally applicable to the Navy, nothing of any differences in the way their ships operate, or the amount of time they spend in port, for instance. Instead, e. g., they say they will, if they yield, have a terrible time computing payroll deductions and contributions, life insurance benefits and contributions, retirement benefits, and lump sum payments for accumulated annual leave, in face of two levels of basic pay. The Navy, with the valor of ignorance,

apparently, steamed into these mine-strewn waters two and a half years ago, and by now should have been blown-up, if the mines were really there. No instance of this occurring is reported. In stating its position, March 12, 1974, Commerce made no reference to any effort by it to ascertain the Navy experience and see whether it supports the existence of these asserted perils.

Whether there are really two levels of basic pay and other questions if any, that are pertinent, are problems we are compelled to suppose and do suppose the Navy has solved. Should there be some it has not, there remain the Comptroller General, the Civil Service Commission, and this court. In the circumstances we think the reasons assigned for asserting the "public interest" exception are mere rhetoric. We are not required to conjure up reasons to support an exercise of discretion when the agency has supplied none. We hold that Commerce has abused its discretion in making the determination here involved.

Accordingly, the defendant's motion for summary judgment is denied. The plaintiffs' cross motion for summary judgment is granted. Judgment is entered for the plaintiffs and the cause is remanded to the Trial Division for further proceedings under Rule 131(c) to determine the amount, if any, to be awarded to each of the 41 plaintiffs, consistent with this opinion.

KUNZIG, Judge (concurring):

Based on the facts of this case, I am compelled to concur. While it is possible that a factual distinction could be shown to justify different policy considerations for the Department of Commerce and the Navy, no such distinction has been asserted by the Secretary of Commerce here. Moreover, the mere raising of the possibility of such a factual distinction by Government counsel in the first instance at oral argument is too belated to require a trial at this time.

However, in an appropriate case on another day, this same result might not be mandated. If, as the Government has now asserted, these seamen employed by the National Oceanic and Atmospheric Administration (NOA), were at sea only 3 months of the year and did not, in fact, work overtime in a normal working week, then there would be no reason why this special wage supplement should be included in computing their vacation pay. Under such circumstances, were this supplement to be added, the vacation pay would then be higher than the normal weekly base pay received by NOA seamen instead of equal thereto.

On the facts timely presented for the purpose of deciding these cross-motions for summary judgment, no basis has been shown which would justify different policy considerations for the Department of Commerce and the Navy. Therefore, I concur in the opinion of the court.

---

## APPENDIX ONE

### NAVY STATEMENT

The Military Sea Transportation Service (now the Military Sealift Command) was established in 1949 as the single service manager for ocean transportation of the Department of Defense. M.S.C. provides logistic support to battle fleet elements and a system of seagoing transportation for personnel and cargo for all elements of the DOD. It also operates ships in support of scientific research projects and other programs of DOD components and other government agencies.

Almost coincidental with the formation of MSC (then MSTS) the Classification Act of 1949 (63 Stat. 955, October 28, 1949) was passed. Chapter 782, Section 202(8) provided in pertinent part:

This chapter * * * shall not apply to—

* * * * * *

(8) officers and members of crews of vessels, whose compensation shall

be fixed and adjusted from time to time as nearly as consistent with the public interest in accordance with prevailing rates and practices in the maritime industry;

This provision was the successor to the provision contained in the 1945 Federal Employees Pay Act which stated, in pertinent part:

Employees of the Transportation Corps of the Army of the United States on vessels operated by the United States, * * * may be compensated in accordance with the wage practices of the maritime industry.

In 1966 the provisions were restated in 5 U.S.C. § 5342, and in 1972 in 5 U.S.C. § 5348. Thus, for all of its existence MSC has been *mandated* by Congress to compensate its seagoing employees * * as nearly as consistent with the public interest in accordance with prevailing rates and practices in the maritime industry.

From the very beginning of its existence MSC had difficulty in determining the "prevailing rates and practices" of the maritime industry for the simple reason that there was, and still is, no single uniform rate or practice in the industry. In 1949 MSC ships sailed in every ocean and sea in the world. MSC ship operating commands were located in New York, Honolulu, New Orleans, San Francisco and Seattle as well as in foreign countries such as Japan and Panama.

Rates of pay and practices in the U.S. geographical areas were established by negotiation between ship owners and the labor organizations dominent in that area. After much study and review it was determined that MSC compliance with the congressional mandate could best be accomplished by establishing two basic sets of rates and practices, one for the Pacific Ocean area and one for the Atlantic Ocean area. Inasmuch as at the time there were at least five and as many as seven unions negotiating with ship owners on the several coasts, this

required establishing 10–14 wage schedules. Within each schedule there were variations due to the size and power of the ship. Later, when MSC began operating tankers, additional classifications of pay were required. Now, in 1974, the situation has become somewhat less complex. Most of the large international officer unions have eliminated geographical differences so that, for example, Engineer Officers and Deck Officers have, geographically, uniform rates of pay. On the other hand, since the dominant union of unlicensed seamen on the West Coast is different from the East Coast union, MSC still maintains separate Pacific and Atlantic schedule of wages for unlicensed personnel. That this program generates much more administrative problems is evident; the decision to maintain the different schedules is based on SECNAV's policy to adhere as closely as possible to the Congressional mandate.

Apart from any consideration of MSC however, the differences in pay and practice between the East Coast and West Coast unions, although many and complex, in total result in approximately the same return for his labor to the seaman on each coast. That this is so is, of course, a fact of union life; no union leader can persevere for very long, if his membership can find greener pastures elsewhere.

The mechanics of complying with the statute are deceptively simple; i. e., every time there is a change in compensation or practice in the maritime industry, MSC reviews it, determines if it is in the public interest, and if so, recommends to the Secretary of the Navy that it be adopted. Unfortunately the process is more complicated. Changes in prevailing rates and practices require constant careful monitoring to assure timely reaction to changes in the industry. Not every change, however, is within the scope of the act. For example, a recent change in the agreement between the Marine Engineers Beneficial Association, representing the licensed engineers, and the ship owners, provided for extra com-

pensation to engineers on tankers during the period that cargo (oil) was being transferred to another ship at sea. In the past few years MSC has been engaged in underway fuel replenishment of combat ships. In this program MSC civilian marine employees have replaced military personnel on what were commissioned ships, and perform all the refueling duties heretofore performed by the military. Simultaneously, a test program was conducted with one or two commercial tankers, wherein these ships on opportune occasions would also refuel a combat ship. Since the Navy ships engaged in this program were more numerous, and were engaged in the refueling operation, day in and day out, in ships especially configured for underway fuel replenishment, it was felt that there was no practice prevailing in industry; rather, what prevailing practice there was was within [the] Navy. Similarly, because of the unique nature of many MSC operations, there is no counterpart operation in the private sector of the maritime industry. In such cases MSC has had to recommend to the Secretary of the Navy and to the Department of Defense Wage Fixing Authority rates, and sometimes practices, interpolated from industry rates and practices.

In the matter under scrutiny, MSC in 1968 determined that a pay practice which had been negotiated in the private sector by the engineer and deck officers was within the scope of 5 U.S.C. § 5348 (then § 5342) and recommended its adoption to the Secretary of the Navy. It was approved by the Department of Defense on 8 November 1968 retroactively to 16 June 1968. To understand the ramifications of this change, some preliminary information is necessary.

a. Duty hours of deck or engineer officers in a ship at sea are eight in a spread of 24; usually worked 4 hours on duty, then 8 hours off. For example, an engineer on watch will work from midnight until 0400 (4 a. m.) and then be relieved. He returns to duty at 1200 (noon) and works until 1600 (4 p. m.).

This pattern is repeated for all watchstanding officers and non-officers seven days a week, because obviously a ship at sea does not come to rest on weekends. Regardless of the time of the watch worked the weekday watches are on "regular" or "straight" time. That is, the first 40 hours which are served Monday through Friday are at the level of pay authorized for the position. The 16 hours worked on weekdays [weekends] are overtime hours and are so compensated. Thus, every watchstanding officer is, for all intent and purposes, guaranteed 16 hours of overtime a week while at sea. There are, however, some deck and engineers [engineer] officers who do not stand watches, and who therefore do not receive this weekend salary. These are usually the senior officers; the Master, First Officer, Chief Engineer and First Assistant Engineer. So that there would be a financial incentive to aspire to and to remain in these positions, the unions and the maritime industry, through negotiation over the years have compensated the incumbents of these non-watchstanding positions by including *in their base pay* a sum known in the industry as "non-watchstanding compensation". The choice of this name is, perhaps, unfortunate. It does not represent payment for work not performed; it is an industry pay practice established in recognition of a need to insure that supervisors are paid at least as much as their subordinates, and in recognition, insofar as the Master and Chief Engineer are concerned, of the fact that they are on duty 24 hours a day. Another point which must be remembered is that the non-watchstanding compensation received by the officers described above does *not* represent their overtime rate multiplied by 16 hours a week. For example, the overtime rate of a Chief Engineer, Class A3, is $20.07 per hour. If he were to [be] paid this rate for 69⅓ hours a month, his non-watchstanding compensation would be $1,391.50. Instead it is less than half this figure, $649.19.

Prior to the 1968 changes in the industry practice, the differences in wages paid aboard ship and the wages paid during vacation periods were either negligible for those who received non-watchstanding compensation or exceedingly large for those who were accustomed to receive 16 hours of overtime a week. The first group, whose rate of pay for the position included the non-watchstanding compensation gave up only that additional premium pay that was forthcoming because of some unusual work performed; the other group were paid leave only at their regular Monday to Friday rate. This represented, over a month, a loss of approximately 40% of their regular earnings on ship. In the 1968 negotiations, therefore, the unions sought to equalize, to some extent, the "take home" pay of this group. It can also be assumed that the unions desired to make the vacation periods more desirable, as a mechanism to induce shipboard officers to go on leave and thus make work for their unemployed brethren. In any event, effective 16 June 1968, those officers who were accustomed to working weekend watches aboard ship were granted 2 benefits, among others. The first was an additional 15 days a year vacation; the second was an increase in their vacation rate of pay. This increase, although called non-watchstanding compensation, is not equivalent to their normal overtime earnings; again, it represents less than 50% of that amount.

In the case of the unlicensed personnel on the East Coast a somewhat similar set of facts obtained before June 1972. The unlicensed deck or engine seamen in a commercial ship are either watchstanders or day workers. The watchstanders are guaranteed 16 hours [a] week overtime; the day workers are not. Traditionally, therefore a day worker's rate of pay is higher than that of watchstander. For example, the monthly rate of pay in 1972 of a Watchstanding Able Seaman was $544.88; the rate of pay of a day-working Able Seaman (Maintenance) (a rating which has the identical requirements and whose incumbents are interchangeable with ABs) was $619.77. In the real world of a ship at sea, however, practically every unlicensed crew member works some overtime, whether he is a day worker or not. Obviously, cooks and stewards must perform their duties every day of the week; the ship's maintenance is rarely, if ever, up-to-date, etc. Thus, review of a ship's payroll will show a considerable amount of earnings over and above the established rate for every officer and crew member. As in the case of the watch officers before 1968, these additional overtime wages were lost when the employee went on vacation.

So that this overview can be seen in the right perspective it is necessary to depart briefly from the narrative to discuss two pertinent aspects of the marine wage system. First, every maritime union in the American maritime picture has consistently and successfully sought to expand vacation benefits for its membership. At this time, for example a merchant seaman sailing in a commercial ship for 6 consecutive months will earn paid time off, depending upon his rating, as little as 8 weeks and 4 days, up to 19 weeks and 2 days! (Parenthetically, MSC crew members who earn leave based on years of service will accumulate annual, sick, and shore leave for the same period of between 5 weeks and 6 weeks 1½ days!). The pressure on the unions to seek additional vacation benefits stems from a desire to spread work among unemployed seamen and to make seagoing a more acceptable occupation. The old days of long in-port visits to glamorous cities in faraway places is fast disappearing. Ships earn profits only at sea. The tendency for modern ships is unload/load in the shortest time possible and then get back to sea. Some large tankers never actually dock in a port. They are loaded and unloaded by fuel lines stretching into an anchorage area. As a result, crewmembers are lucky to get a few hours if any, ashore during a long voyage.

The other aspect of the pay picture is the compensation practice on the West

Coast. In that area, unions of unlicensed seamen and management have negotiated a wage rate based on a 56 hour week. This rate recognizes that shipboard employees usually work every day at sea; the important aspect of this pay rate, for the purpose of this discussion is that it is paid for all vacation time.

To return to the narrative, then, we see in the unlicensed crewmember situation, before 1972, on the East Coast, a picture of longer (and it must be said, mandatory) vacations at a·rate of pay far below the individual's customary earnings. His counterpart on the West Coast, on the other hand enjoys a fairly constant rate of take home pay. Small wonder that in 1972, the dominant East Coast union negotiated what is called in their agreement with East Coast ship owners a "monthly base wage for vacation only". This vacation base rate is calculated by adding an agreed upon sum, which in 1973 varied between $30 and $70 and in 1974 between $45 and $105, to the regular shipboard rate. In the case of the unlicensed unions as well as in the case of the officer unions, the negotiations with ship operators typically treat the matter of days of vacation apart and separately from rates of pay for vacation.

In 1968 MSC was given approval by SECNAV/DOD to increase the rate of leave pay of licensed deck and engineer officers by an amount reached by applying the industry non-watchstanding formula. In 1972, MSC was given approval to match the monthly base wage for vacations only, agreed upon between the shipping interests and the dominant East Coast unlicensed union. The approval related only to MSC ships operated by COMSCLANT.

\*    \*    \*    \*    \*    \*

[Legal argument omitted.]