Nichols, Judge,
delivered the opinion of the court: Plaintiffs in this case are civilian federal maritime personnel who are or were employed as engineering officers aboard government ships owned and operated by the Navy Military Sealift Command (MSC). They are members of the National Marine Engineers Beneficial Association, AFL-CIO (MEBA), and its subordinate ordinate local, District No. 1 - Pacific Coast District. Pursuant to Executive Order 11491, as amended, MEBA has been designated the exclusive bargaining representative for all units of licensed marine engineers employed aboard MSC vessels. The facts in this case are not in dispute, and the issue is whether under 5 U.S.C. § 5348 (1976) the MSC was required to adopt certain pay practices generally prevailing in the maritime industry. Plaintiffs say defendant did not follow this statute in fixing their pay. We do not agree and accordingly grant defendant’s motion for summary judgment.
The operative language of 5 U.S.C. § 5348(a), provides that:
* * * [T]he pay of officers and members of crews of vessels * * * shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in *379 accordance with prevailing rates and practices in the maritime industry. [References to this present codification of this statute include previous codifications where the context requires.]
In June 1972, MEBA negotiated a collective bargaining agreement with commercial shippers providing, among others, the following benefits, which are the subject of this dispute:
(1) The Chief Engineers shall not receive less than 3.166 days of time off or cash in lieu thereof for work in port during overtime hours with respect to each month of said employment.
(2) When a vessel is in port, under port time conditions, between Monday and Friday, inclusive, but excluding Saturdays, Sundays and holidays, each Senior Licensed Engineer in charge of a watch shall share equally the total premium pay for watchstanding in port after 5:00 P.M. and before 8:00 A.M.
(3) On automated, semi-automated, or retrofit diesel ships, both dry cargo and tankers, a pay rate of 10% above scale prescribed for diesel vessels of equal power tonnage would be paid.
The government concedes that the provision guaranteeing overtime for chief engineers is a pay practice prevailing in the maritime industry. The chief engineer is the top engineering officer. When the ship is at sea, he bears the full responsibility for any mechanical failures. For all intents and purposes he is on call 24 hours a day, with no opportunity to accumulate overtime. In contrast, lower level marine engineers "stand watches” seven days a week at sea, eight hours a day in split shifts, and consequently are guaranteed at least 16 hours of overtime each week. See generally Blaha v. United States, 206 Ct. Cl. 183, 200, 511 F.2d 1165, 1173 (1975). Counsel say the special provision of guaranteed overtime was adopted in order to put the chief engineers on a par with subordinate engineers as to take-home pay, and to provide a financial incentive to shoulder the added responsibilities of the position. For reasons peculiar to the industry, commercial carriers chose to structure the pay scale in this fashion, rather than achieve the same result simply by incrementing the basic pay of chief engineers.
The second contested pay practice provides that each senior licensed engineer in charge of watches while in port *380 shall share equally in the premium pay for watchstanding between 5:00 p.m. and 8:00 a.m. As explained by plaintiff, the day engineer in port is generally the second assistant engineer. The first and third assistant engineers stand the night watches, for which they receive premium (as opposed to overtime) pay. The bulk of the maintenance work generally occurs on the day shift rather than on the higher paid night shifts. One way to accomplish equality of pay and workload would be to rotate watches evenly among the three assistant engineers. However, in the experience of the private sector, it is economically disadvantageous to rotate the second assistant engineer, who undertakes particular responsibility for the repair and maintenance of boilers. Thus, the industry adopted the practice of dividing the premium pay as a compromise measure, equalizing pay among the senior watchstanding engineers while simultaneously promoting efficiency in operations.
Finally, plaintiffs seek to require that the MSC adhere to the industry practice of paying a rate 10 percent above diesel scale on automated, semi-automated and retrofit diesel ships. This practice is designed to penalize reduced manning on board such ships, a measure which creates a concomitant increase in the degree of responsibilities and the duties of engineers serving on these vessels.
On September 29, 1975, MEBA made a formal request to MSC that it follow the prevailing rates and practices negotiated between MEBA and various operators of deep sea vessels by agreeing to the three aforesaid provisions. On November 3, 1975, MSC denied MEBA’s request. In regard to the 3.166 days of overtime for chief engineers, MSC stated that the clause would violate a prohibition of payment for overtime work not performed. MSC rejected the practice of giving 5 hours of premium pay to each senior watchstanding engineer on the ground that it could not agree with a union that one employee should share his earnings with another or that an employee receive premium pay for working non-premium pay hours. In essence, the government took the position that this would be an illegal assignment of pay. The last practice requested by MEBA, that MSC institute a pay rate of 10 percent above diesel scale on automated, semi-automated and retrofit diesel vessels, was denied as contrary to the public interest.
*381 In arguing its position, defendant relied initially not only on section 5348(a), supra, but also on related provisions governing the pay of federal civilian shore side employees. One of these is 5 U.S.C. § 5544(a) (1976) which provides:
An employee whose pay is fixed and adjusted from time to time in accordance with prevailing rates under section 5343 or 5349 of this title, or by a wage board or similar administrative authority serving the same purpose, is entitled to overtime pay for overtime work in excess of 8 hours a day or 40 hours a week. * * * [Note § 5348 is not mentioned.]
The government’s refusal to adopt the 3.166 days of guaranteed overtime pay for chief engineers is or was grounded in its belief that section 5544 prohibits overtime pay for hours not worked. Defendant cited several decisions of this court in support of the principle that section 5544 authorizes overtime pay only for actual overtime hours worked. E.g., Detling v. United States, 193 Ct. Cl. 125, 432 F.2d 462 (1970); Moss v. United States, 173 Ct. Cl. 1169, 353 F.2d 746 (1965); Rapp v. United States, 167 Ct. Cl. 852, 340 F.2d 635 (1964). See also Bowser v. United States, 215 Ct. Cl. 168 (1977). These, however, are all cases where § 5348 was not apparently involved. In Daniels v. United States, 187 Ct. Cl. 38, 407 F.2d 1345 (1969), which did involve § 5348 (ship pilots), the court noted that it is the "administrative responsibility [of the Secretary of the Navy] to determine how closely the salaries of the specified personnel can parallel the maritime industry’s rates and still be 'consistent with the public interest.’ ” Id. at 41, 407 F.2d at 1347. Defendant shifts in its reply brief to assert only that in light of the statutory policy disfavoring payment of overtime rates for non-overtime hours, it was certainly not arbitrary for the Secretary to conclude that the public interest would not be advanced by following this industry practice.
The government’s rejection of the second pay practice, the equal division of premium pay among senior watchstanding engineers, is based on a similar principle that an employee may not receive premium pay for non-premium pay work. Again, defendant states that § 5544 mandatorily requires that engineers working the nighttime shifts receive pay at the overtime rate for the hours worked *382 between 5:00 p.m. and 8:00 a.m. According to defendant, under the statute the government has no authority to transfer premium pay earned by night engineers to the day engineer. Again, in its reply brief, the government restates its position as resting on the ultimate conclusion that a pay practice contrary to the policy enunciated in section 5544 is, in its estimation, inconsistent with the public interest.
In support of its determination that it would not be appropriate to pay 10 percent above diesel scale on automated, semi-automated and retrofit diesel vessels, defendant noted that the "standard manning” concept used in private industry is inapplicable to MSC ships. The involved 10 percent is really a penalty for under manning, a condition not admitted to exist in government ships. To insure operational flexibility the MSC may set manning standards which differ from those of private industry but which are designed to achieve the requisite safety of the ship, cargo, and crew, and to enable the vessels to carry out their missions. Defendant also notes that at present the MSC already pays its crews on diesel vessels 10 percent above the pay scale applicable to steampowered vessels of comparable size. The additional 10 percent for engineers on automated, etc., diesel powered ships is often referred to as "ten on ten.” In light of these factors and the need for flexibility in manning these vessels, at the outset the government rejected this particular pay practice as inconsistent with the public interest.
Plaintiffs offer several counter arguments. For example, with regard to defendant’s argument that guaranteed overtime and sharing of premium pay violates a public policy established in section 5544, plaintiffs note that other seamen employed by the government, in particular, radio officers, are sometimes compensated at overtime rates for work not actually performed. Their principal point is that defendant has misconstrued the pertinent pay statutes. Plaintiffs emphasize that in the recent case of Blaha v. United States, supra, this court ruled that section 5348 is the sole source of pay rights of seamen employed by the government, including entitlement to overtime or premium pay. The criterion set forth in section 5348 is that a prevailing pay practice in the private sector should be adopted unless inconsistent with the public interest. When *383 this criterion is applied, plaintiff argues, the justifications offered by defendant are not valid to support its refusal to implement the provisions in question. Plaintiffs reason that section 5544 and other factors relied on by defendant do not apply and should not even have been considered, much less regarded as controlling, in making the decision. It is urged that on the basis of Blaha we must find the government’s refusal to adopt the pay practices at issue to be arbitrary, founded on an impermissible motive to avail itself of the bargaining concessions made to private industry, without accepting the counter-balancing bonuses. Finally, to the extent the government relies on the public interest clause, plaintiffs contend defendant has not met its burden of proving that the pay practices are not in the public interest.
The degree of discretion vested in the government to fix seamen’s pay under section 5348 has been litigated previously in other contexts. See, e.g., Benevento v. United States, 198 Ct. Cl. 772, 461 F.2d 1316, cert. denied, 409 U.S. 1038 (1972); Daniels v. United States, supra; Amell v. United States, 182 Ct. Cl. 604, 390 F.2d 880, cert. denied, 393 U.S. 852 (1968). Blaha v. United States, supra, however, was the first case to concentrate on construction of the phrase "consistent with the public interest.” The controversy in Blaha was sparked by the Commerce Department’s refusal to implement a privately prevailing seamen’s wage increase which had been adopted by the Navy. The court concluded that the Commerce Department was required to pay the same wage increase as that agreed upon by the Navy. In discussing the interrelationships of civilian pay provisions, the court noted that by its own terms section 5544 "does not apply to section 5348 employees.” We continued:
We think Congress meant to authorize Government agencies owning and operating ships, with civilian crews, to adopt private industry pay practices in their totality, as to differentials, overtime, premiums, or any other general pay practice that entered into and became a part of the seaman’s take-home pay, subject of course to the "public interest” exception to be discussed presently. A partial and selective adoption of some but not all of such practices simply does not make sense with reference to any objective the Congress could conceivably have been *384 seeking to achieve. Adoption of the base pay alone, or the base pay plus regular overtime, would be worthless, because those terms have meaning, and are counters used in bargaining, in the relationship they bear to all the factors in the equation. Bargainers may accept a detriment in one part of the pay package in exchange for a benefit in another, i.e., they may take better premium pay for poorer base pay, or the reverse, as apparently happened in the Pacific. Interpretation of the statute to hold the seamen are bound by the concessions they made but don’t get the bonuses they bargained for, is not likely to obtain industrial peace on the sea lanes, or further any other purpose. [206 Ct. Cl. at 191, 511 F. 2d at 1168.]
The purpose of enacting section 5348 was to recognize that shoreside government pay practices were inappropriate in regard to setting the pay of civilian seamen.
With this background in mind, we think the government’s statements it now makes or did make, that it is powerless to approve these practices because of conflicts with section 5544, are incorrect. As we interpreted section 5348 in Blaha, defendant not only is authorized, but is encouraged, to adopt prevailing industry practices if they are "consistent with the public interest.”
Defendant’s references to the overtime statute, section 5544(a), are or at least at the outset were confusing and hard to follow. This court has squarely held that section 5544(a) does not override section 5348 or prescribe a mandatory exception thereto. In Benevento v. United States, supra, we held that it was not an abuse of discretion, in the case of vessels employed in fisheries research, to select as a comparable industry to conform to a Boston fishing fleet which paid no overtime whatsoever, and in such a case, employees who worked 12 hours a day earned no overtime under section 5544(a), or otherwise. Where, as often with seamen, base wages are set high in light of the long hours necessarily worked at sea, it would be absurd to take that base pay and erect a time and a half provision for hours over eight, on top of that, thus providing an unbargained windfall for fishermen or seamen lucky enough to work for the government as owner. Section 5348 was clearly written to provide the contrary.
Although the Blaha plaintiffs prevailed in their suit, this does not mean that there is any overall requirement that *385 the government must routinely accept prevailing maritime industry pay practices. As the court stated therein, "[w]e think the 'public interest’ exception was written to provide flexibility needed to eliminate anomalies and inequities that might arise from a too literal conformity to industry pay practices.” In Blaha the Navy Department had readily agreed to follow the disputed practice, but the Attorney General decided to defend as the government position the contrary view of the Commerce Department, causing the court to wonder if under the circumstances the reasons asserted by the government in support of its "public interest” position were perhaps not "mere rhetoric.” While the reasons enumerated by defendant herein in support of its public interest position are not significantly more compelling than those raised in Blaha, unlike that case we do not have the aberration of two separate government agencies assuming opposite stances on the question.
We conclude that in this case the government might properly have adopted the pay practices in issue. However, within its discretion, defendant is also entitled to invoke the public interest clause. In this case we do not find that the net impact of refusing to follow the requested pay practices is so great as to render defendant’s decision an attempt to deny the seamen the benefits they won in bargaining, while taking advantage of their concessions. Although, for example, we deem the rhetoric directed against the 3.166 days of overtime for chief engineers to be somewhat misleading, in a sense the union itself brought about the problem by structuring this pay device as overtime. Federal law does after all make somewhat of a fetish of overtime in other than the maritime context. Officials administering section 5348 may well at least take a sideways glance at this fact. The integrity of overtime provisions, statutory or bargained, may well be endangered by phantom overtime not really worked. In Amell v. United States, 384 U.S. 158 (1966), the Supreme Court held that we had jurisdiction of suits of this kind because they did not sound in admiralty. Officers and seamen on government vessels were legally civil servants who happened also to be sailors, rather than sailors who happened to be civil servants. The Court pointed to a wide variety of laws it said section 5348 did not preempt: sick leave and vacation pay, *386 death, health, medical, and pension programs, and workmen’s compensation, as well as the absence of the right to strike. 384 U. S. at 160-63. In view of the fact that individuals are willing to serve as chief engineers aboard government ships we presume that the government has found some other way to make the position more attractive than that of lower level engineers. According to the appendix in Blaha, there is or was a direct premium for non-watchstanding chief engineers. See 206 Ct. Cl. at 200, 511 F.2d at 1173.
Similarly, in the case of senior watchstanding engineers, the effect is de minimis. The government characterization of this as an illegal assignment is absurd. Clearly, on a private ship, the portion of night duty premium that is surrendered by equalization never accrued to the officer who would have earned it, so he could not assign it. But, apparently these engineers on government ships are permitted and encouraged to rotate their shifts in such a manner as to equalize premium time worked, thus achieving the same result in the long run, with no saving in payment by defendant.
Finally, the reason given for refusing to pay 10 percent above diesel scale on automated, semi-automated and retrofit diesel ships, that is, preservation of flexibility needed to satisfy peculiar military requirements, appears to be valid, and not in the least arbitrary.
In short, we are not willing to say that in these circumstances the government’s refusal to adopt these three prevailing pay practices was so arbitrary or capricious as to constitute an abuse of discretion. Courts are not endowed with the wisdom to decide everything of a public nature, and in particular, wage practices on public vessels are subjects with which we are not much at home. Unless the abuse of discretion is flagrant, as in Blaha, it appears better not to see it in every decision that we ourselves would not make. If the decisions were mistaken, there exist mechanisms for correction that are quicker and surer than litigation.
Finally, before closing, we would like to comment on the way in which the "public interest” clause was invoked. As in Blaha, it appears that at first the government officials relied on other factors in reaching their decision, and then *387 belatedly took the "retreat position” that the contested pay practices were not consistent with the public interest. The record does not reveal the source of the officials’ authority. In this instance the court is willing to overlook the fact that invocation of the "public interest” is made to appear very much of an afterthought, in view of the recency of Blaha, the first case construing section 5348 in this context. In the future, however, we will expect express identification of the public interest clause at the outset as the source of authority for declining to follow a prevailing private sector pay practice. At that time, and not later, after commencement of litigation, the government should set forth its reasons for the benefit of the union and subsequent judicial review. The official or board making the decision should have a proper delegation of authority.
Accordingly, plaintiffs’ motion for summary judgment is denied, defendant’s cross-motion for summary judgment is granted, and plaintiffs’ petition is dismissed.