**NATIONAL MARITIME UNION OF AMERICA, AFL–CIO, et al.**

v.

**The UNITED STATES.**

No. 495–79C.

United States Court of Claims.

June 16, 1982.

---

Sidney H. Kalban, New York City, Atty. of record, for plaintiffs. Phillips & Cappiello, P. C., New York City, of counsel.

William D. White, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant. Robert Reutershan, Dept. of the Navy, Robert Gilliat, Dept. of Defense, and Eric Moll, Dept. of Commerce, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and SMITH, Judges.

SMITH, Judge:

In this civilian pay case we are called upon to decide whether the executive branch, pursuant to its anti-inflation program, may limit pay increases of certain prevailing rate employees to the rates of increase imposed on other federal employees by statute. Specifically, we must decide whether the phrase "as nearly as is consistent with the public interest" in the statutory provision for prevailing rate mariners vests the mariners' employer agencies with the discretion to override the general purpose of the prevailing rate statute: providing parity of pay between the public and private sectors. On the parties' cross-motions for summary judgment, we conclude that the agencies do have such discretion and that it was properly exercised in this case.

Plaintiffs here are the National Maritime Union of America, AFL–CIO (NMU),[1] and 34 federal seamen, represented by NMU, who are employed by the National Oceanic and Atmospheric Administration (NOAA) of the Department of Commerce and the Military Sealift Command (MSC) of the Department of the Navy.

## I.

The mariners in this case are employed by the Government on ships operated by NOAA and MSC. They are prevailing rate employees, which means that their wages are set generally in accordance with wages in comparable private industry jobs in the particular locality, rather than in accordance with a uniform nationwide system like the General Schedule.[2] The wages of plain-

---

1. The original petition filed by NMU only was amended, pursuant to our order dated July 3, 1980, to name NMU and 34 specific individuals as plaintiffs. Defendant asserts that NMU is not a real party in interest and should be dismissed pursuant to Rule 61.

2. See *Clark v. United States*, 454 U.S. ——, ——, 102 S.Ct. 805, 807, 70 L.Ed.2d 768 (1982).

tiff employees are governed by section 5348(a) of title 5.[3]

As implemented, prior to fiscal year 1979 (beginning October 1, 1978), the effect of section 5348(a) had been that the increases in federal pay equaled those paid by private industry under collective bargaining agreements with NMU. Beginning in fiscal 1979, however, Congress, concerned with the rising rate of inflation, imposed ceilings on the pay of Government employees. Congress enacted these ceilings for the fiscal years 1979,[4] 1980,[5] and 1981.[6] Only the fiscal 1981 pay ceiling specifically referred to section 5348, which covers plaintiffs; the others referred only to employees covered by section 5343.

Nevertheless, in fiscal 1979 and 1980, the President directed the agencies to place a 5.5 percent ceiling on pay increases for, among others, the employees here concerned. The President's memorandum,[7] in pertinent part, read:

> The success of our anti-inflation effort is critical to the economic well-being of the nation. To achieve this success, it is vital that the Government in managing its own affairs, join with the rest of the nation in a positive commitment to reducing inflationary pressures. Accordingly, I have determined that it would be inconsistent with the public interest for any category of Federal pay rates to be increased by more than 5.5 percent during fiscal year 1979.

> \* \* \* \* \* \*

> In the public interest to control inflation, each officer or employee in the executive branch who has administrative authority to set rates of pay for any Federal officers or employees should exercise such authority, to the extent permissible under law, treaty, or international agreement, in such a way as to ensure that no rate of pay for any category of officers or employees is increased more than 5.5 percent during fiscal year 1979. \* \* \*

A similar order, using the same language, was promulgated for fiscal 1980 by the Director of the Office of Personnel Management (OPM), limiting fiscal 1980 pay increases to 7.02 percent.[8] Plaintiffs here challenge these administratively imposed caps for the fiscal years 1979 and 1980. It is undisputed that plaintiffs' counterparts in private industry received substantially higher increases during this period.

Plaintiffs have also challenged certain overtime and premium pay practices of NOAA in connection with the pay ceilings. In fiscal 1979 (June 6, 1979) and fiscal 1980 (June 16, 1980), MSC increased premium pay by 7.5 percent and 12.83 percent, respectively (the industry rate), while NOAA did not. MSC also paid overtime at these above-ceiling rates, while NOAA did not. The Government confesses judgment as to the unpaid NOAA premium pay, but suggests that the MSC overtime pay should have been limited by the pay ceiling. Both parties have moved for summary judgment on this issue also.

## II.

The statutory provision for prevailing rate employees (the prevailing rate system) is found in subchapter IV of chapter 53 of title 5, United States Code, comprising sections 5341 through 5349.[9] Section 5341 as a whole states the *policy* of Congress for the fixing and adjustment of rates of pay of prevailing rate employees. That policy in-

---

3. 5 U.S.C. § 5348(a)(1976).

4. Treasury, Postal Service, and General Government Appropriations Act, 1979, § 614(a), Pub.L.No. 95–429, 92 Stat. 1001, 1018 (1978).

5. Treasury, Postal Service, and General Government Appropriations Act, 1980, § 613(a), Pub.L.No. 96–74, 93 Stat. 559, 577 (1979).

6. Joint Resolution of October 1, 1980, § 114(a), Pub.L.No. 96–369, 94 Stat. 1351, 1356.

7. Memorandum from President Carter, 15 Weekly Comp. of Pres. Doc. 8 (Jan. 4, 1979).

8. Memorandum from Alan K. Campbell, Director of OPM, Oct. 3, 1979.

9. 5 U.S.C. §§ 5341–5349 (1976 & Supp. IV 1980).

cludes four enumerated and specific *principles*, set out in the statute. Section 5341 reads, in its entirety:

> It is the policy of Congress that rates of pay of prevailing rate employees be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and be based on principles that—
>
> (1) there will be equal pay for substantially equal work for all prevailing rate employees who are working under similar conditions of employment in all agencies within the same local wage area;
>
> (2) there will be relative differences in pay within a local wage area when there are substantial or recognizable differences in duties, responsibilities, and qualification requirements among positions;
>
> (3) the level of rates of pay will be maintained in line with prevailing levels for comparable work within a local wage area; and
>
> (4) the level of rates of pay will be maintained so as to attract and retain qualified prevailing rate employees.

The structure of subchapter IV indicates that section 5341 relates generally to the entire subchapter, just as the definitions section (§ 5342) does.

Sections 5343, 5348, and 5349 provide the specific authority for setting wages for different groups of employees. Section 5343 covers the vast majority of prevailing rate employees;[10] section 5349 covers certain organizations; and section 5348(a) applies to federal mariners. Section 5348 reads, in pertinent part:

> (a) * * * the pay of officers and members of crews of vessels * * * shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry.

Both of the sections of particular significance here, 5341 and 5348, contain an identical formula: "fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates." These are the operative words of section 5348(a),[11] and they have been used continuously since the appearance of the phrase in the Classification Act of 1949.[12] This phrase (the 1949 phrase) has therefore survived, in virtually identical form, 33 years, a recodification of title 5 in 1966,[13] and a complete revision of the prevailing rate system in 1972.[14] The 1966 and 1972 actions made no changes in the meaning of the 1949 phrase in section 5348(a).[15] By contrast, the present section 5341 has no predecessors.[16] Our case turns on the

---

**10.** The first sentence of § 5343(a) reads: "The pay of prevailing rate employees shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates." 5 U.S.C. § 5343(a) (Supp. IV 1980).

**11.** *Blaha v. United States*, 206 Ct.Cl. 183, 188, 511 F.2d 1165, 1166 (1975). *See also Barratt v. United States*, 218 Ct.Cl. 242, 247, 585 F.2d 1041, 1045 (1978) (interpreting § 5349 by reference to § 5348).

**12.** Classification Act of 1949, ch. 782, § 202(8), 63 Stat. 954, 955, originally codified at 5 U.S.C. § 1082(8). In this context, mariners were being excepted from the general classification and wage-setting, which themselves embodied a principle of comparability with compensation in the private sector, a principle clearly subjected to "public interest" considerations.

**13.** Act of Sept. 6, 1966, § 1 [5 U.S.C. § 5342(a)], Pub.L. No. 89–554, 80 Stat. 378, 471. The present § 5348(a) was codified in 1966 at 5 U.S.C. § 5342(a). The basic structure of the subchapter governing prevailing rate employees, however, was set at this time.

**14.** Act of Aug. 19, 1972, § 1(a) [5 U.S.C. § 5348(a)], Pub.L. No. 92–392, 86 Stat. 564, 572. This revision added some sections to subchapter IV, notably § 5341, and renumbered them all, but the present § 5348(a) was not altered in any substantive way.

**15.** H.R.Rep.No. 901, 89th Cong., 1st Sess. 3 (1965) (no substantive changes intended by recodification); S.Rep.No. 791, 92d Cong., 2d Sess. 6, 1972 U.S.Code Cong. & Ad.News, 2980, 2985 (§ 5348(a) restates existing law).

**16.** S.Rep.No. 791, 92d Cong., 2d Sess. 3, 1972 U.S.Code Cong. & Ad.News 2982.

meaning of the 1949 phrase in the context of the present section 5348(a).

## A.

The first question to be addressed is whether section 5348(a) permits any agency discretion at all in the setting of wages or whether it simply mandates equivalence between the public and private sectors. We hold that discretion is intended and we have so held on previous occasions.

The language of the key phrase commands such an interpretation. "[A]s nearly as is consistent with the public interest" qualifies or limits the main thrust of the sentence, which is "fixed and adjusted from time to time * * * in accordance with prevailing rates." We may draw two conclusions from this structure. First, the primary purpose of the statute is to ensure that the pay of these employees will be comparable to those in the private sector.[17] Second, the public interest is a consideration placed in opposition to equality of pay. The language "as nearly as is consistent with" anticipates that equality of pay may *not* always be entirely consistent with the public interest. These countervailing considerations create a kind of tension in the statute which is crucial to the system, as it provides the administrative discretion needed to operate efficiently a wage system.[18]

The existence of the countervailing considerations has been recognized in the three leading cases interpreting section 5348(a) and its predecessors (which use

identical language): *Blaha v. United States*,[19] *Daniels v. United States*,[20] and *Daigle v. United States*.[21] In *Blaha*[22] we stated:

We think Congress meant to authorize Government agencies * * * to adopt private industry pay practices * * * subject of course to the "public interest" exception * * *.

And the court in *Daniels*[23] concluded:

[T]he stated provision vests the Secretary of the Navy with great discretion in setting wages. It is his administrative responsibility to determine how closely the salaries of the specified personnel can parallel the maritime industry's rates and still be "consistent with the public interest."

The question whether the pay shall be fixed in accordance with, or *nearly* in accordance with, and, if the latter, *how* nearly to, prevailing rates, depends upon the public interest. The point, summed up in *Daigle*, is that the phrase "consistent with the public interest" creates discretion in the agency in appropriate circumstances to decline to set federal wages at exactly the same rate as industry wages.[24] The 1972 legislative history confirms the existence of discretion: "The guidelines are not extensive. They will not bind the hands of the executive branch too firmly."[25] Thus, plaintiffs' first argument—that section 5348(a) in itself requires equal wages—must fail. Discretion inheres in the 1949 phrase.[26]

17. *See* H.R.Rep.No. 339, 92d Cong., 1st Sess. 7 8, 19, 25 (1971).

18. *See Blaha*, 206 Ct.Cl. at 194, 511 F.2d at 1170; *Adams v. United States*, 141 Ct.Cl. 133, 134 (1958).

19. *Blaha*, 206 Ct.Cl. 183, 511 F.2d 1165.

20. *Daniels v. United States*, 187 Ct.Cl. 38, 407 F.2d 1345 (1969).

21. *Daigle v. United States*, 217 Ct.Cl. 376 (1978).

22. *Blaha*, 206 Ct.Cl. at 191, 511 F.2d at 1168.

23. *Daniels*, 187 Ct.Cl. at 41, 407 F.2d at 1347.

24. *Daigle*, 217 Ct.Cl. at 384–85. *See also Benevento v. United States*, 198 Ct.Cl. 772, 461 F.2d 1316, *cert. denied*, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 486 (1972); *Beatteay v. United States*, 198 Ct.Cl. 989 (1972) (order); *Benham v. United States*, 198 Ct.Cl. 990 (1972) (order); *Ayres v. United States*, 186 Ct.Cl. 350 (1968); *Amell v. United States*, 182 Ct.Cl. 604, 390 F.2d 880, *cert. denied*, 393 U.S. 852, 89 S.Ct. 88, 21 L.Ed.2d 122 (1968); *Adams*, 141 Ct.Cl. at 143; *Barratt*, 218 Ct.Cl. 242, 585 F.2d 1041.

25. 118 Cong.Rec. 21017 (1972) (remarks of Sen. McGee, floor manager of the bill).

26. *Ayres*, 186 Ct.Cl. at 259–60.

Not only does the 1949 phrase create discretion in the agency by setting up a countervailing consideration to equal pay, but the discretion it creates is broad,[27] as is generally the case for the Government's wage-setting authority.[28] It follows that our scope of review of wage decisions is limited.[29] With this in mind, we turn to the standards by which this discretion is guided.

## B.

The phrase, "as nearly as is consistent with the public interest," does not give agencies a great deal of guidance in determining when they may set maritime wages at less than parity with industry. Moreover, the case law by and large does not address this level of the problem; rather, it concentrates on the existence and breadth of discretion. Our most recent pronouncement on this issue, in fact, complained that the content of the public interest had not been sufficiently developed by the Government in justifying its actions.[30]

The Court of Appeals for the District of Columbia Circuit, however, has directly addressed the problem of the content of the public interest in subchapter IV. In *National Federation of Federal Employees v. Brown*, the court of appeals, over a dissent, held that "the public interest" in section 5343 (structurally cognate to 5348(a)) has no independent meaning beyond the four principles enumerated in section 5341.[31]

The *National Federation of Federal Employees* case involved nonappropriated fund workers whose salaries, while governed by the prevailing rate statute, are not paid out

of appropriated funds. Like plaintiffs, they were not named in the fiscal 1979 pay ceiling, but their fiscal 1979 pay increase was frozen at 5.5 percent pursuant to the President's memorandum. The district court held that the administration's anti-inflation policy was a legitimate exercise of the public interest provisions, and, absent any indication that the pay ceiling act specifically required equal pay for nonappropriated fund workers, the administratively imposed pay cap was effective.[32]

The court of appeals reversed. It noted that an important purpose of the 1972 overhaul of the prevailing rate system was to provide guidelines for executive action.[33] The court recognized room for administrative discretion, but held that it was to be exercised entirely within the framework of the four principles listed in section 5341. The court found that the nonappropriated fund workers' case presented a conflict between the first and third principles—equal pay within the Government (§ 5341(1)) *versus* equal pay with private industry (§ 5341(3))—and held that the Government had failed to make this balancing in limiting pay increases.[34]

Judge Robb, dissenting, argued that the public interest has the broad meaning the Government would give it.[35]

In my judgment the prevailing rate statute means what it says: the executive has discretion, in the public interest, to deviate from wage schedule figures. So long as he does not abuse his discretion I think he does not exceed his authority. * * * He reasonably and properly con-

27. *Blaha*, 206 Ct.Cl. at 189, 511 F.2d at 1167; *Benevento*, 198 Ct.Cl. at 777–78, 461 F.2d at 1320.

28. *See United States v. Testan*, 424 U.S. 392, 406, 96 S.Ct. 948, 957, 47 L.Ed.2d 114 (1976); *Barratt*, 218 Ct.Cl. at 248, 585 F.2d at 1045.

29. *Daigle*, 217 Ct.Cl. at 386; *Daniels*, 187 Ct.Cl. at 41, 407 F.2d at 1347.

30. *Daigle*, 217 Ct.Cl. at 387.

31. *National Fed'n of Fed. Employees, Local 1622 v. Brown*, 645 F.2d 1017 (D.C.Cir.1981), rev'g *National Fed'n of Fed. Employees v. Brown*, 481 F.Supp. 704 (D.D.C.1979), and

*American Fed'n of Gov't Employees v. Brown*, 481 F.Supp. 711 (D.D.C.1979).

32. *National Fed'n of Fed. Employees*, 481 F.Supp. at 707–10; *American Fed'n of Gov't Employees*, 481 F.Supp. at 716–18.

33. *National Fed'n of Fed. Employees, Local 1622*, 645 F.2d at 1023–24.

34. *Id.*, 645 F.2d at 1024–25.

35. *Id.*, 645 F.2d at 1027–28 (Robb, J., dissenting).

cluded that the wage schedule rates were inflationary and therefore not "consistent with the public interest."

The district court also emphasized that the "plain language" of the statute confers broad discretion upon the agency.[36] Since the legislative history of the prevailing rate system is in the main unilluminating on this point, it is by and large the language of section 5348(a) on which we must rely.

The decision of the court of appeals was based exclusively upon its interpretation of section 5341 and its relationship to section 5343. We do not believe that the reasoning of the court of appeals in *National Federation* is applicable to section 5348(a) for three reasons. First, the principles listed in section 5341 do not eclipse the public interest language even within section 5341, so the four principles cannot completely control section 5348(a). Second, the retention from 1949 of the public interest phrase in section 5348(a) indicates that it, not the four principles, is to be given primary effect in interpreting section 5348(a). Third, section 5348(a) was intended to be a restatement of pre-1972 law, so the principles added in 1972 could not change significantly the meaning of section 5348(a).

■ 1. Even the language of section 5341 itself [37] does not suggest that "the public interest" equals merely the four stated principles. As noted above, the phrase "fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates" has been used continuously since 1949.[38] In section 5341, added in 1972, the four stated principles are simply tacked onto this longstanding rule and are connected to it by the

conjunctive "and." This hardly suggests that the principles were intended to supplant the "public interest" or the "in accordance" language; rather, it demonstrates that Congress *added* new, more specific considerations to the traditional standard expressed in the 1949 phrase.

This interpretation is not at all inconsistent with the 1972 legislative history to the effect that Congress wanted to supply guidelines for agency discretion.[39] If Congress had intended to supersede the 1949 phrase, or to encompass its entire meaning, it would have made more sense to *replace* the 1949 phrase with the enumerated principles alone, or at least to make the equation express. It would have been unnecessary to retain the 1949 language that invokes an additional consideration that permits departure from "equality" to "nearness."

It has been held by this court that "the public interest" in the 1949 phrase is a limitation on the equal pay policy.[40] In using the four principles to supersede the public interest, therefore, the interpretation of the court of appeals must be able to account for the countervailing statutory considerations which give the agency flexibility. The second, third, and fourth principles—respectively, gradation by seniority, responsibility, and qualifications; comparability with the private sector; and need to attract and retain qualified personnel—have little if any potential for supplying this tension with the equal pay goal.[41] So the court of appeals put great emphasis on the first principle: comparability of pay among all prevailing rate employees in all

---

**36.** *National Fed'n of Fed. Employees,* 481 F.Supp. at 707 09.

**37.** *See* text at note 9, *supra.*

**38.** *See* notes 12–14, *supra.*

**39.** 118 Cong.Rec. 21017 (1972) (remarks by Sen. McGee), cited in *National Fed'n of Fed. Employees, Local 1622,* 645 F.2d at 1023–24.

**40.** *Daniels,* 187 Ct.Cl. at 41, 407 F.2d at 1347; *Blaha,* 206 Ct.Cl. at 191, 511 F.2d at 1168; *Daigle,* 217 Ct.Cl. at 384–85.

**41.** 5 U.S.C. § 5341(2), (3), (4). In the instant case, as in *National Fed'n of Fed. Employees, Local 1622,* parity with the collective bargaining agreement would easily meet these three criteria: the private system no doubt has the elementary gradations imposed by § 5341(2); it obviously would be the same as the private sector as required by § 5341(3); and such parity would necessarily tend to attract and retain quality personnel as mandated by § 5341(4).

federal agencies within the locality.[42] It must follow from this interpretation that the first principle constitutes virtually the entire meaning of "the public interest."

While this produces a tidy system, it unrealistically restricts the scope of the public interest, an expansive concept encompassing a broad range of considerations and discretion to deal with them. We are reluctant to ascribe to Congress the intention to give such an expansive term such a cramped meaning, with no clear indication either in the legislative history (of 1949, 1966, or 1972) or in the statutory language. We would stultify ourselves if we ignored our prior rulings which do recognize the independent vitality of "the public interest," even if we now disagreed with that view, which we do not. We must conclude, therefore, that the principles enumerated in section 5341 merely add to and perhaps also clarify those inherent in the 1949 phrase.

2. The language of section 5348(a) itself offers no support for the theory that "the public interest" is subsumed into the four (or one) principles in section 5341. In the 1972 revision of subchapter IV, section 5348(a) retained the 1949 phrase and only that phrase.[43] As a result, section 5348(a) repeats the public interest language of 5341, but not the four principles. While it must be admitted that section 5341 has application to section 5348(a), the retention solely of the 1949 phrase must indicate that "the public interest" *can* stand on its own and that it has an independent meaning and significance, as of course it must have had

before 1972.[44] Had Congress intended to incorporate section 5341 entirely and exclusively into section 5348(a), it would have been far clearer to do so expressly,[45] instead of by repetition of one part of section 5341 and exclusion of another part.

Section 5348(a) also has an independent and longer lineage than section 5341, as we have seen from its language and position in the subchapter. It would therefore not be sensible to set its use of the 1949 phrase at nought by collapsing it into—and thereby limiting its content to—section 5341, or worse, to one part of it.

3. The independent heritage of section 5348(a) is confirmed by its 1972 legislative history which shows, well nigh conclusively, that section 5348(a) cannot be governed entirely by 5341. The legislative history expressly states that section 5348(a) is "a restatement of existing law."[46] The new provision "continues without change the existing authority" to set wages.[47] Our decisions have consistently recognized this continuity.[48] It is therefore impossible that the four principles enumerated in 1972 could alter the range of discretion mandated by the 1949 phrase and described in our pre-1972 opinions,[49] of which Congress must be deemed to have been aware.

To recapitulate, we do not hold that section 5341 does not apply to section 5348(a). It does, generally. We do hold that the four principles enumerated in section 5341 do not exhaust the meaning of—and hence the range of discretion provided by—the

42. *National Fed'n of Fed. Employees, Local 1622*, 645 F.2d at 1024–25. Indeed, the case's precise holding is that the Government failed to consider and balance the conflict between § 5341(3) and § 5341(1). *Id.*

43. Compare 5 U.S.C. § 5348(a) (1976) with Pub.L. No. 89–554, § 5342(a), 80 Stat. 471 (1966).

44. Compare *American Fed'n of Gov't Employees v. Campbell*, 659 F.2d 157, 163 (D.C.Cir. 1980) ("public interest" in §§ 5341 and 5343 "surely provides agency officials with some flexibility in setting wage increases").

45. The statute might have read, for example, "set in accordance with the policy expressed in

section 5341 of this title." However, it does not.

46. S.Rep.No.791, 92d Cong., 2d Sess. 6, 1972 U.S.Code Cong. & Ad.News 2985.

47. H.R.Rep.No.339, 92d Cong., 1st Sess. 18 (1971). *See also* 117 Cong.Rec. 27685 (1971) (remarks of Rep. Griffin, supporter of the bill).

48. *Blaha*, 206 Ct.Cl. at 189, 511 F.2d at 1167; *Daigle*, 217 Ct.Cl. at 381, 383.

49. *Benevento, supra* note 24; *Daniels, supra* note 20; *Ayres, supra* note 24; *Amell, supra* note 24; *Adams, supra* note 18.

 Both *Blaha* and *Daigle* relied on *Daniels*.

public interest. We come to this conclusion for three reasons: the legal rules governing section 5348(a) predate the enumerated principles and Congress expressly stated that those rules are not changed by the principles;[50] the repetition of the 1949 phrase in section 5348(a) suggests that it—and not the four principles—is to be given primary importance in interpreting section 5348(a); and to the extent that section 5341 affects section 5348(a), it does not have the narrow meaning urged by plaintiffs.

## C.

■ Congress affected the prevailing rate system by enacting ceilings on pay increases for the fiscal years 1979, 1980, and 1981.[51] As we have said, the ceilings for fiscal 1979 and fiscal 1980 did not cover the mariners, but the fiscal 1981 ceiling did.[52] Plaintiffs argue, based on the maxim, *expressio unius est exclusio alterius*, that Congress must have intended specifically to exclude section 5348(a) employees from the fiscal 1979 and 1980 ceilings.

The pay ceilings for fiscal 1979 and 1980 are not, however, wholesale revisions of the prevailing rate system. They only limit, as to particular classes of employees, and only for specific years, the upper end of the agency discretion, which is otherwise undisturbed. The acts do not purport to revise or repeal the prevailing wage system any more than pay ceilings on the General Schedule for the same years repealed the

General Schedule system.[53] The ceilings do not require that the increases be exactly 5.5 percent. Far from setting wages for all prevailing rate employees, the pay ceilings for fiscal 1979 and 1980 simply have no direct effect on federal mariners paid under section 5348(a). The underlying discretion in the agencies therefore remains. The doctrine of *expressio unius* provides only an inference, albeit a strong one, which can and should be overcome by the direct meaning of the statute.

The legislative history of the fiscal 1979 and 1980 pay ceilings is sketchy in this regard, but it does indicate that the exercise of administrative discretion to limit pay was not antithetical to the congressional intent. The Senate report[54] of the fiscal 1979 act said:

> This provision would be applicable to *all Federal agencies* and is based on the desire that *all Federal employees* be treated equally as to fiscal year 1979 salary increases. [Emphasis supplied.]

Similarly, the legislative history of the fiscal 1980 pay ceiling specifically notes two exceptions to the pay ceiling—workers earning less than $4.22 per hour[55] and workers whose wages are set by collective bargaining[56]—but never mentions seamen.

Finally, plaintiffs argue that the sudden inclusion of section 5348 in the fiscal 1981 pay ceiling indicates retroactively that the exclusion of 5348 in fiscal 1979 and 1980 was deliberate. While this reading is plau-

---

**50.** It is this aspect of § 5348(a), not present in § 5343, which may well distinguish the instant case from *National Fed'n of Fed. Employees, Local 1622.* To the extent that § 5343 was changed in 1972, the rule announced by the court of appeals in that case could never be dispositive of the instant one. If that is the case, § 5341 would have a different effect on—indeed, meaning for—§ 5343 than on § 5348. While there is no direct authority in the statutory structure or legislative history for such a difference, it is not necessarily an implausible or unworkable result.

**51.** *See* notes 4–6, *supra*, respectively. Each act will be referred to by the fiscal year in which it was effective: Pub.L. No. 95–429, § 614(a), in fiscal 1979; Pub.L.No.96–74, § 613(a), in fiscal 1980; and Pub.L.No.96–369, § 114(a), in fiscal 1981.

**52.** Pub.L.Nos.95–429, § 614(a), and 96–74, § 613(a), covered employees described in § 5342(a)(2)(A), while Pub.L.No.96–369, § 114(a), covered both §§ 5342(a)(2)(A) and 5348.

**53.** *See, e.g.,* Treasury, Postal Service, and General Government Appropriations Act, 1979, § 614(a), Pub.L.No.95–429, 92 Stat. 1001, 1018 (1978).

**54.** S.Rep.No.939, 95th Cong., 2d Sess. 56 (1978).

**55.** H.R.Rep.No.471, 96th Cong., 1st Sess. 16 (1979) (conference report).

**56.** *Id.*

sible, the meaning for fiscal 1979 and 1980 of the fiscal 1981 inclusion is at best informed speculation.[57] It could mean that Congress changed its mind, or it could mean that Congress was correcting an error, or was considering the issue for the first time, or any number of things, none of which is objectively more likely than any of the others. The legislative history of the fiscal 1981 pay ceiling offers no explanation, or even recognition, of the change, which suggests, if anything at all, that no fundamental change was intended.

To sum up, the pay ceilings for fiscal years 1979 and 1980 are temporary, narrow limitations on the discretion mandated by the prevailing rate system. Since they do not refer to the mariners covered by section 5348(a), the discretion inherent in that provision remains unchanged.

### D.

The final question is whether, given the broad administrative discretion conferred by section 5348(a), it was exercised properly. The public interest factor and the exercise of lawful discretion were expressly invoked by the President and the director of OPM in their fiscal 1979 and 1980 memoranda.[58] In the *Daigle* case we objected to the Government's failure to identify the public interest criteria except as a *post hoc* rationalization.[59] Here, the Government has mended its ways and followed precisely the procedure we demanded. Having on previous occasions held that the public interest factor creates great discretion in setting wages,[60] the identification of that public interest need not be made a protean toil. The Government here distinctly identified the public interest.

Whether fighting inflation by limiting federal wages is in fact "in the public interest" or "critical to the well-being of the nation" is a question about which the court is not empowered to make a judgment on the merits. It is abundantly clear, however, that such a policy is rational and reasonable in light of a particularly recognized and pervasive crisis, and is not arbitrary or capricious. Such judgments are within the executive competence to make and we are in no position to second-guess them.

Certainly a wage survey was not necessary in order to recognize the existence of the inflationary crisis. Nor does any absence of that crisis in the past combined with a past tradition of adopting prevailing schedules convert this system to one subject entirely to negotiated wages.

There are limits, of course, to the discretion inherent in section 5348(a), and we have had occasion to address them. The fundamental limitation is that the discretion not be exercised so as to frustrate the congressional scheme.[61] This did not occur here. While the purpose of the prevailing rate statute is to keep reasonable parity between public and private employees and to protect blue collar workers' salaries from mere administrative whim or convenience,[62] there is no escaping the fact that federal mariners are federal employees. " * * * Congress thought of these petitioners more as government employees who happened to be seamen than as seamen who by chance worked for the Government." [63] Congress never meant to exclude these employees from all of the burdens and duties of federal employment. The pay ceilings did not deny increases, nor were the increases

---

**57.** The problem is in attempting to determine intent *retroactively.* Plaintiffs' argument that § 5348 was to be excluded would be far more compelling if § 5348 had first been included and then dropped.

**58.** *See* notes 7, 8, *supra.*

**59.** *Daigle*, 217 Ct.Cl. at 386–87.

**60.** *Daniels*, 187 Ct.Cl. at 41, 407 F.2d at 1347.

**61.** *Blaha*, 206 Ct.Cl. at 194, 511 F.2d at 1170.

**62.** 118 Cong.Rec. 21018 (1972) (remarks of Sen. McGee); 117 Cong.Rec. 27684 (1971) (remarks of Rep. Hanley).

**63.** *Amell v. United States*, 384 U.S. 158, 163, 86 S.Ct. 1384, 1387, 16 L.Ed.2d 445 (1966). This, of course, compares with the policy in § 5341(1) of equality among federal employees in a locality. *See also Daigle*, supra note 21; note 54, *supra.*

granted drastically lower than those in private industry,[64] especially when the fiscal 1981 "catchup" increase is taken into account. We cannot say that the pay caps frustrated the congressional intent.

In *Blaha* we found also that it was arbitrary and capricious for the Commerce Department to have one concept of the public interest and the Navy to have another one, diametrically opposed.[65] Commerce, on public interest grounds, refused to pay a monthly leave supplement, as was the practice in private industry, while the Navy did pay it. The *Blaha* court found that the invocation of the public interest by Commerce was "mere rhetoric," not a concerted effort to determine what the public interest was.[66] Here, by contrast, the whole point of the administratively imposed ceiling was to ensure uniformity throughout the Government,[67] and that view of the public interest was a rational one, asserted from the very beginning. It was not, as in *Blaha*, "mere rhetoric," [68] nor simply a *post hoc* rationalization.[69]

 The permissible discretion in setting wages under section 5348(a) is very broad and our scope of review correspondingly narrow.[70] We cannot say in this case that the Government's imposition of pay ceilings was so arbitrary and capricious as to constitute an abuse of discretion. Unless there is a flagrant abuse of discretion, this court will not meddle in an administrative wage-setting process the supervision of which is committed by statute to the agency.[71] Plaintiffs have not met their heavy burden of showing that the Government's action was arbitrary or clearly wrong,[72] so we must grant defendant's motion for summary judgment and deny plaintiffs' cross-motion.

## III.

The secondary issue raised by the parties relates to certain premium and overtime pay. In fiscal 1979 and 1980, MSC did not apply the pay ceiling either to premium or to overtime pay. At the same time, NOAA applied it to both. Claiming entitlement to the industry equivalent for both types of pay from NOAA, plaintiffs invoke the *Blaha* holding that the difference between MSC and NOAA indicated that NOAA had abused its discretion in limiting pay where MSC practice could not be shown to harm the public interest.[73]

Defendant responds with a general theory for the application of pay ceilings to overtime and premium pay. Defendant suggests that the pay ceilings apply to base pay and, by implication, to all pay calculated from base pay. Thus, the fiscal 1979 and 1980 pay caps applied to overtime pay, which is calculated from base pay, but not to premium pay, which is set independently, based on prevailing rates. Defendant therefore confesses judgment for premium pay not paid by NOAA and reserves the right to make a counterclaim for overtime pay improperly paid by MSC.

This narrows the dispute to NOAA overtime pay. We accept defendant's confession of judgment as to NOAA premium pay; no counterclaim for MSC overtime pay being presently before us,[74] we do not decide the question; and both parties agree that MSC premium pay was correctly paid.

 The application of the fiscal 1979 and 1980 pay ceilings to MSC and NOAA

---

**64.** *See also Barratt,* 218 Ct.Cl. at 250, 585 F.2d at 1046.

**65.** *Blaha,* 206 Ct.Cl. at 195, 511 F.2d at 1170.

**66.** *Id.,* 206 Ct.Cl. at 196, 511 F.2d at 1171.

**67.** Memorandum from President Carter, *supra* note 7.

**68.** *Blaha,* 206 Ct.Cl. at 196, 511 F.2d at 1171.

**69.** *See Daigle,* 217 Ct.Cl. at 386–87.

**70.** *See* notes 27, 29, *supra.*

**71.** *Daigle,* 217 Ct.Cl. at 386.

**72.** *Daniels,* 187 Ct.Cl. at 42, 407 F.2d at 1347.

**73.** *Blaha,* 206 Ct.Cl. at 195, 511 F.2d at 1170–71, considered at notes 65–69, *supra.*

**74.** The Government proposes to seek a waiver from the Comptroller General under 5 U.S.C. § 5584 (1976 & Supp. IV 1980) for this amount.

base pay does not depend upon the express language of the pay ceiling legislation but upon an administrative decision that the pay ceiling acts expressed the public interest by reference to which the agencies were to exercise their discretion.[75] The agencies cannot, therefore, claim that the terms of the acts legally require them to limit overtime pay because it is calculated from base pay. Rather, overtime pay, like base and premium pay, is entrusted to the sound discretion of the agencies.

The Government's position, espoused for the first time in their filing of June 5, 1981,[76] is clearly a rational, sensible approach and may well have been a wise exercise of discretion had it been exercised in fiscal 1979 and 1980. However, that is not the situation now.[77] Here we are presented with a difference between MSC and NOAA practices very similar to the discrepancy in *Blaha*. It would be highly unfair to employees if their wages were subject to reduction and reimbursement whenever the Government decides to exercise its discretion differently. Were the lower pay compelled by law, a counterclaim might be appropriate, but here the issue is exercise of discretion.

 In Part II of this opinion we emphasized that plaintiffs' case for base pay did not fit into any of the situations in which we had found abuse of discretion, among them the unjustified difference between agencies in *Blaha*. It follows that with overtime pay, *Blaha* commands that we grant plaintiffs relief. To exercise its discretion in the opposite way from MSC to the detriment of its employees, NOAA must show either that the MSC pay was illegal or that it was contrary to the public interest.[78] MSC acted within its range of discretion, so its action is not illegal. As to the public interest, again, it may be that MSC's discretion would have been better exercised as NOAA did, but the fact is that it was not.

NOAA cannot show that MSC's policy was detrimental to the public interest. Therefore, *Blaha* controls and plaintiffs are entitled to uncapped overtime from NOAA.

## IV.

As to plaintiff National Maritime Union of America, AFL–CIO, the petition is dismissed pursuant to Rule 61. We conclude, on the parties' cross-motions for summary judgment, and after hearing oral argument, that the individual plaintiffs are not entitled to additional wages based on the decision of NOAA and MSC to limit their fiscal 1979 and 1980 base pay in accordance with executive directives. Defendant's motion for summary judgment is granted and plaintiffs' cross-motion is denied in that regard. We also conclude that those plaintiffs who were employed by NOAA are entitled to additional overtime and premium pay in accordance with prevailing rates. In this regard, plaintiffs' cross-motion for summary judgment is granted, defendant's motion is denied, and this part of the case (discussed in Part III) is remanded to the trial division pursuant to Rule 131(c) for calculation of damages consistent with this opinion.

COWEN, Senior Judge, dissenting:

With deference, I cannot join in the court's decision. I am convinced that the Government acted without statutory authority in imposing a cap on plaintiffs' wages for the fiscal years 1979 and 1980, because in doing so, the Executive Department completely ignored the guidelines set by Congress. As shown in the majority opinion, Congress fixed ceilings on the pay of some Government employees for the fiscal years 1979 and 1980, but no such action was taken with respect to the plaintiffs until Congress enacted the Joint Resolution of October 1, 1980, section 114(a), Pub.L. 96–369, 94 Stat. 1351, 1356.

---

**75.** This is the burden of Part II of this opinion.

**76.** "Defendant's Response to Portions of Plaintiff's [*sic*] Cross-Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment."

**77.** *Blaha*, 206 Ct.Cl. at 195, 511 F.2d at 1170.

**78.** *Id.*, 206 Ct.Cl. at 193–95, 511 F.2d at 1169–71.

Therefore, the only authority which the Executive Department had to adjust the wages of plaintiffs for the fiscal years 1979 and 1980 were the prevailing rate statutes —5 U.S.C. § 5341, which applies to plaintiffs and to other prevailing rate employees, and 5 U.S.C. § 5348, which applies only to plaintiffs. In the latter statute, Congress directed that these employees be compensated as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry. The parties have agreed that under this procedure, the pay of plaintiffs employed by both NOAA and MSC is fixed by reference to the current rate schedule contained in the industrywide collective bargaining agreement between National Maritime Union and the various commercial maritime employees signatory thereto.

## I.

In the fiscal years 1979 and 1980, President Carter directed that the agencies place a 5.5 percent ceiling for the employees here concerned. The sole basis for his order was that the action was required in "the public interest to control inflation." The same action was promulgated for the fiscal year 1980 by the Director of Personnel Management, which limited the fiscal 1980 pay increases for these employees to 7.2 percent. It is agreed that during the fiscal years 1979 and 1980, plaintiffs' counterparts in private industry received substantially higher increases for those years than the amounts fixed by the Executive Orders. There is no evidence and no contention by the Government that in placing a cap on plaintiffs' pay for the years in dispute, the executive agencies gave any consideration to the statutory guidelines set forth in section 5348.

Under the facts stated, the issue to be decided is not whether section 5348 grants "some discretion" to the Executive Department to adjust the wages of plaintiffs, as the majority has stated. Rather, the issue is whether section 5348 grants to the Executive Department such unrestricted and unlimited discretion that it was authorized to ignore completely the statutory guidelines in fixing the pay of plaintiffs for the years 1979 and 1980. This question was recently answered in the negative by the Court of Appeals for the District of Columbia in *National Federation of Federal Employees v. Brown*, 645 F.2d 1017 (1981), hereinafter referred to for convenience as *"Brown."*

There, as here, a cap was imposed on the pay of nonappropriated fund employees solely on the basis of President Carter's memorandum of January 4, 1979, without any statutory authority to impose a ceiling on the pay of these employees. There, as here, the statutory guidelines provided for in section 5341 with respect to these employees were ignored. In reversing the district court's judgment in favor of the Government the court of appeals declared:

We conclude that the "public interest" clauses do not bear the weight the district court placed on them. Rather, we believe that executive discretion to fix and adjust pay rates for members of the class herein is circumscribed by the principles Congress enumerated in 5 U.S.C. § 5341 (1976): (1) equal pay for equal work in all federal agencies within the same locality; (2) differences in pay for substantial differences in duties, responsibilities, and qualification requirements; (3) rates of pay maintained in line with rates paid locally for comparable work in the private sector; (4) rates of pay maintained at a level that attracts and retains qualified employees. If other principles are to augment, modify, or supplant this list, Congress must supply the authorization. (645 F.2d at 1019)

\* \* \* \* \* \*

[T]he 5.5% pay cap for nonappropriated fund workers might be justified under the first principle Congress supplied, equal pay for equal work in all federal agencies within the same locality. But the executive action at issue must be tied to a legislative direction giving content to the words "public interest." Congress did not authorize the executive to go outside its guidelines and attribute to those words any nonarbi-

trary meaning the President finds consonant with the nation's welfare. (645 F.2d at 1019–20)

\* \* \* \* \* \*

The sole matter appropriately resolved at this juncture by the court is whether the executive branch has correctly applied the statute that establishes its authority. We hold that it has not. Under the structure of government— the separation of powers—established by the Constitution, the President has no authority to alter policy and principles declared by Congress even if, at the time the President acts, signals from Congress suggest it would approve the President's action. \* \* \* (645 F.2d at 1025)

\* \* \* \* \* \*

We must therefore reject the sole position advanced by the Government in support of the contested executive action—that the President remains free to define the "public interest" in any reasonable manner and without reliance upon the explicit standards Congress set to constrain executive discretion. (645 F.2d at 1025)

\* \* \* \* \* \*

We hold that the public interest clauses do not have a life of their own, separate and distinct from the guides Congress enumerated in the prevailing rate statute. We therefore conclude that the defendants acted impermissibly in capping the wages of nonappropriated fund workers solely on the basis of the President's anti-inflation program. \* \* \* (645 F.2d at 1025)

The court has attempted, unsuccessfully I think, to distinguish *Brown* but a comparison of the two opinions, will show that the *ratio decidendi* of *Brown*, is in direct conflict with the reasoning underlying the court's decision. In reality, *Brown* provides stronger support for the claims of these plaintiffs than for the nonappropriated fund workers involved there. The reason for this is that the guidelines of section 5341, applicable to the nonappropriated fund workers, allow for an adjustment to their pay equivalent to that paid to other Federal employees working under similar conditions. Not so with these plaintiffs. As this court stated in *Blaha v. United States*, 206 Ct.Cl. 183, 193–94, 511 F.2d 1165, 1169 (1975):

> The Congress in enacting § 5348 recognized the unique character of the pay practices in the maritime industry. It saw that the pay practices existing shoreside with respect to Government employees would be a Procrustes bed if applied to Government vessels and to civilians employed as seamen thereon, union members doing the same work as their commercial counterparts. Its solution was to authorize pay practices to conform "as nearly as is consistent with the public interest", not to Government shoreside practice, but to private industry practice afloat: \* \* \*.

The reference to *Blaha* leads me to the observation that the court's decision also collides head-on with the basic holding in *Blaha*. Strangely, the court relies on *Blaha* despite Judge Nichols' pronouncement in that case that:

> We think the "public interest" exception was written to provide flexibility needed to eliminate anomalies and inequities that might arise from a too literal conformity to industry pay practices. It was not written to authorize a complete frustration of the Congressional scheme. Since Commerce relies so heavily on the imaginary horrible, let us too suggest one: if Commerce can do what it has done with the relatively minor vacation supplement, it can refuse to apply § 5348 in any part, declaring the entire wage scheme resulting from collective bargaining not to be "consistent with the public interest." (206 Ct.Cl. at 194, 511 F.2d at 1170)

Here we have a complete frustration of the Congressional scheme, because the wages of the plaintiffs for 1979 and 1980 were set by disregarding entirely the guidelines specified by Congress.

As authority for its position, the court cites: *Benevento v. United States*, 198 Ct.Cl. 772, 461 F.2d 1316, *cert. denied*, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 486 (1972); *Beatteay v. United States*, 198 Ct.Cl. 989 (1972); *Benham v. United States*, 198 Ct.Cl. 990 (1972) and *Daniels v. United States*, 187 Ct.Cl. 38, 407 F.2d 1345 (1969). These decisions are inapposite, for as the court stated in *Blaha:* "These cases * * * involved the selection of the segment of the maritime industry to be treated as the model for comparison." (206 Ct.Cl. at 189, 511 F.2d at 1167) None of them involved a situation where no consideration whatever was given to the statutory guidelines.

The only decision cited by the majority which I think is consistent with its opinion is *Daigle v. United States*, 217 Ct.Cl. 376 (1978). Admittedly, I cannot reconcile *Daigle* with the central holding in *Blaha* with respect to the application of the public interest clause. Nevertheless, I would hold that *Brown* and *Blaha* have correctly decided how the public interest clause should be applied in adjusting the wages of employees under the provisions of 5 U.S.C. §§ 5341 and 5348.

## II.

In an effort to buttress its conclusions, the majority has cited a good deal of legislative history. As I read the history, it provides even less support for the court's decision than the decisional law.

In an apparent effort to show that the guidelines have little significance, the majority quotes the following statement made by Senator McGee: "The guidelines are not extensive. They will not bind the hands of the executive branch too firmly." This statement was taken out of context from Senator McGee's statement. He was the floor manager of H.R. 9092, which was enacted in 1972, as Public Law 92–392, 86 Stat. 564. As the court stated in *Brown*, he explained that the purpose of the bill was to anchor executive decisions to statutory guidelines and policy. A reading of his complete statement will, I believe, show that the majority has misconceived the Congressional intent. Senator McGee's statement follows:

But the system is not perfect and it is not established under statute as determined by the legislative power of the Government. The President may at his discretion revise the system, and the 650,000 employees in the system do not have the assurance of guidelines established by law. We often, in our rhetoric, brag about our being a nation under law, not under men. Yet, here would seem to be a flagrant denial of that somewhat sacred principle—at least, rhetorically. When we contrast the status in Federal Government, in the inequity that now exists, with the circumstances in other segments of the Nation's business community, we can appreciate the change that is required. For example, if one is running a small shop on Main Street, the authority to change things around and issue new orders without legislative guidelines may be desirable. That is the way we run our offices, for example. We hire and fire as we please. We pay our employees what we think they are worth, based on individual judgments, or what our sense of compassion and humanitarianism inspires us to provide. But when you are running the biggest business in the world, which is the Government of the United States, you just cannot run a responsible store that way. We do not do it that way for any other Federal employees. There has been a classified system established by law for the civil service for 50 years. There was a classification system established by law for postal workers until the enactment of the Postal Reorganization Act, and that system of classification and pay was carried over into the new, semi-independent postal agency until superseded by collective bargaining. The wage board employees are the only group in the executive branch who do not have either a formal job classification and pay system established by law or collective bargaining options. The time is long overdue for establishing such an orderly statutory system.

In its simplest form, that is what H.R. 9092 does. It says that this is going to be the law when it comes to blue-collar workers. This is what the President and the Civil Service Commission and the various agencies in the executive branch are going to do. It is the function of Congress to declare what the policy of the Government shall be. It is the function of the executive branch to carry out that policy. *Guidelines are established in this bill that shall direct the course of administrative action by the Civil Service Commission.* The guidelines are not extensive. They will not bind the hands of the executive branch too firmly. But they will assure 650,000 blue-collar workers that—to borrow a phrase—yes, Virginia, there is a Congress of the United States, and there is a policy for blue-collar employment system. (Emphasis added) (118 CONG.REC. 21017 (1972))[1]

In the debate on the bill, Senator Pell stated:

All too often, the interests of the Government's blue-collar workers have been sacrificed in pursuit of other goals of the Government. Although the stated goal may be fair treatment, there is in the executive branch an understandable, but nonetheless regrettable, temptation to view blue-collar wages as a weapon in efforts to balance a budget, or to combat inflation. When this happens, equity suffers, and the blue-collar worker bears a burden not shared by his fellow workers in private industry.

Since I have been in the Senate, I have maintained close contact with the thousands of prevailing wage employees in the State of Rhode Island and with their elected spokesmen. I have become intimately familiar with their problems and their grievances. On their behalf, and in the interest of fairness, I have worked and tried to correct some of these inequities—for example, wage survey areas that are defined too narrowly to encompass a true labor market, and result in the payment of substandard wages as a

"prevailing" wage. *Or, as another example, the arbitrary freezing of blue-collar wages to combat inflation while workers in nongovernment jobs were permitted wage increases.* (Emphasis added) (118 CONG.REC. 21029-30 (1972)) *x60

In the House, the following remarks of Representative Matsunaga are also indicative of the Congressional intent:

There is * * * virtually universal agreement on the need for some legislation in the area covered by the pending bill. Even the administration has submitted a proposal. The approximately 810,000 prevailing-rate employees of the Government, including 11,000 who work in Hawaii, deserve immediate attention. Their pay is determined by administrative regulation subject to change when administrations change, when a different bureaucrat succeeds to a particular job, or when an administration decides to change its policies. The basic thrust of H.R. 9092 is to enact into law the present procedures used to determine and adjust wages for these workers. (117 CONG. REC. 27681 (1971))

In summarizing the legislative history of the 1972 Act, the court of appeals stated in *Brown:*

Remarks by both supporters and opponents of the 1972 amendments * * * are consistent with Senator McGee's repeated plain statements that the intent was to "set standards of direction" that would control administrative practices and constrain executive discretion. * * * Given this history, it is clear that Congress meant to set, not merely to recommend, policy and principles. (footnotes omitted) (645 F.2d at 1024)

The court also relies on the following statement from Senate Report 939, 95th Cong., 2d Sess. 56 (1978):

This provision would be applicable to *all* Federal agencies and is based on the desire that *all* Federal employees be treated equally as to fiscal year 1979 salary increases. (Emphasis added)

---

1. The references here are to bound volumes of the Congressional Record.

The quotation is wide of the mark. In the first place, it is preceded by a sentence which reads as follows:

Sec. 614. By a rollcall vote of 12 yeas and 9 nays, the Committee approved an amendment providing a ceiling on salary increases for wage board workers during fiscal year 1979 to the 5.5 percent ceiling previously announced by the President for general schedule (GS) employees.

Plaintiffs are not wage board employees. The statement was addressed to the bill which became Public Law 95–429, 92 Stat. 1001, which fixed a ceiling for the fiscal year ending September 30, 1979, for prevailing rate employees described in section 5342(a)(2)(A) of title 5. This section is not applicable to plaintiffs. They are specifically excluded from its coverage by section 5342(b)(3) which exempts from the coverage of the subchapter, crews of vessels described in 5 U.S.C. § 5102(c)(8).

The court also places heavy emphasis on the fact that the public interest clause has been included in the law since 1949, and has subsequently been re-enacted up to and including the 1978 Act. This emphasis on the "old law" seems to me to ignore the general rule that if legislative history is to be relied on, a court must look to the history of the act that was in effect at the time the events in issue occurred. That act was the 1972 Act. As has been demonstrated, the legislative history of the 1972 Act is plainly inconsistent with the court's decision.

### III.

For the reasons stated, I would hold that the 34 persons who have been added to the petition as plaintiffs are entitled to recover the difference between what they were paid during the fiscal years 1979 and 1980, and the pay which their counterparts in private industry received during those years. I concur in the court's decision that they are also entitled to receive premium pay and overtime pay in those years. I also agree with the court that the petition should be dismissed as to the plaintiff, National Maritime Union of America, AFL–CIO.