DEPARTMENT OF THE NAVY, MILITARY SEALIFT COMMAND,
Petitioner/Cross–Respondent,

v.

FEDERAL LABOR RELATIONS AUTHORITY,
Respondent/Cross–Petitioner,

National Maritime Union of America, AFL–CIO, Intervenor.

Nos. 87–3179, 87–3276.

United States Court of Appeals, Third Circuit.

Argued Oct. 23, 1987.

Decided Jan. 12, 1988.

Richard K. Willard, Asst. Atty. Gen., William Kanter, Robert K. Rasmussen (argued), U.S. Dept. of Justice, Civil Div., Washington, D.C., W. Lee Mingledorff, U.S. Dept. of Navy, Office of General Counsel, Washington, D.C., for petitioner/cross-respondent.

Ruth E. Peters, Sol., William E. Persina, Deputy Sol., Jill A. Griffin (argued), Federal Labor Relations Authority, Washington, D.C., for respondent/cross-petitioner.

Sidney H. Kalban (argued), Phillips & Cappiello, P.C., New York City, for intervenor.

Before HIGGINBOTHAM, HUTCHINSON and SCIRICA, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

We have before us the United States Navy's petition for review of a Federal Labor Relations Authority (FLRA) decision ordering the Military Sealift Command (MSC), a department of the Navy, to collectively bargain the intervening union's proposals on pay and pay practices for civilian mariners employed by MSC. Also before

us is FLRA's cross-petition for enforcement of that order. We have jurisdiction over the Navy's petition for review under § 7123(a) of the Federal Service Labor–Management Relations Statute (Labor–Management Statute), 5 U.S.C. §§ 7101–7135 (1982 & Supp. IV 1986).[1] Section 7123(b) provides jurisdiction over the FLRA's cross-petition for enforcement.

The FLRA generally holds that collective bargaining over "conditions of employment" (in which category it includes pay) left to executive agency discretion is not inconsistent with law unless it determines the agency's discretion is "sole and exclusive," or unless it determines the agency has a "compelling need" for the employment practice at issue.

In this case, FLRA held that § 5348(a) of the prevailing rate system does not preclude collective bargaining over pay and pay practices for civilian mariners employed by MSC. It found that the Navy's discretion within § 5348(a) was not "sole and exclusive." It also found no compelling need for the Navy's pay practices and ordered collective bargaining over the five union proposals.

We believe that § 5348 specifically gives the Navy discretion over the pay practices at issue and that bargaining over them is inconsistent with law and therefore beyond the FLRA's power to order. We believe that Congress did not intend to include the Navy's pay and pay practices with respect to MSC's civilian mariners as bargainable matters within the Labor–Management Statute. We therefore grant the Navy's petition for review, set aside the FLRA's decision and deny the FLRA's cross-petition for enforcement.

## I.

■ Normally, an agency's interpretation of the statute it administers is entitled to deference, provided that its interpretation is a permissible construction of the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.

837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). If so, an agency decision may only be overturned if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982); *see also* 5 U.S.C. § 7123(c) (referring to 5 U.S.C. § 706 for standard of review of FLRA order); *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 n. 7, 104 S.Ct. 439, 444 n. 7, 78 L.Ed.2d 195 (1983). However, an agency decision is not entitled to such deference when it interprets another agency's statute or resolves a conflict between its own statute and the statute of another agency. *See New Jersey Air Nat'l Guard v. FLRA*, 677 F.2d 276, 281–82 n. 6 (3d Cir.), *cert. denied*, 459 U.S. 988, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982); *see also Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910, 916 (3d Cir.1981). Review of the FLRA's order to bargain the five Union requests for changes in the Navy's pay and pay practices for MSC's civilian mariners is plenary. *Creque v. Luis*, 803 F.2d 92, 93 (3d Cir.1986).

## II.

The employees involved in this action are civilian mariners working for the MSC, a major component of the Navy's Operating Forces. MSC provides logistical support for battle fleets and ocean transportation for all branches of the armed services. Its primary purpose is to provide immediate sealift capability in an emergency, including combat emergencies. MSC operates approximately 83 government-owned ships and 52 privately owned commercial merchant vessels, including tankers, dry cargo vessels, and cable-laying, repair, research and survey ships. Direct hire, civil service seamen man approximately 59 of the government-owned ships.

The 52 MSC privately owned ships and the 59 government ships manned by civilians are basically organized and operated

---

1. The Labor–Management Statute is Title VII of the Civil Service Reform Act of 1978, Pub.L.

95–454, 92 Stat. 1111, 1191 (1978).

according to practices in the private sector of the maritime industry, but with variations from those private practices. The number of civil service mariners is about 5,210. The National Maritime Union of America, AFL–CIO (Union), intervenor in this action, represents a unit of about 2,000 unlicensed non-officer personnel and 30 stewards in the MSC Atlantic Fleet.

### III.

On April 20, 1982, the Union proposed five changes in the agreement[2] with MSC for civilian mariners:

(1) Division of Watchers

The sailors at sea shall be divided into three watches which shall be kept on duty successively for the performance of ordinary work incident to the sailing and maintenance of the vessel. Not fewer than three (3) seaman [sic] shall constitute a complete seawatch at all times. When any of these three ratings are missing and the watch is not complete, the wages equivalent to the rating that is missing from the watch shall be paid to the other members making up the remainder of the watch.

(2) Work Not Specified

Any work performed by the Stewards' Department that is not specifically defined as routine duties in this Agreement or in the applicable Work Schedule shall be paid at the applicable penalty rate.

(3) Extra Compensation for Underway Replenishment

Unlicensed members of the crew on watch on deck performing services in connection with the actual or simulated refueling operation while the vessel is underway shall receive penalty pay. The Pumpman on duty during his regular hours shall receive penalty pay while pumping cargo during this operation.

(4) Appendix VII, Section 4 of each existing collective bargaining agreement shall be deleted and all other Sections of the agreement shall apply to underway replenishment operations in the same fashion as to all other duties.

(5) Appendix VII, Section 8 of each existing collective bargaining agreement shall be deleted and the contractual call-out provision (Appendix II, Section 3) shall apply to underway replenishment operations.

Joint Appendix at 63–64 (Jt. App.).

The Navy sets pay rates for its civilian mariners according to the prevailing rate system, 5 U.S.C. § 5348(a) (1982). Section 5348(a) states that an agency has discretion to deviate from private pay practices "as nearly as is consistent with the public interest."

Proposals four and five, as well as three, concern underway replenishment, *i.e.*, providing fuel, stores and equipment to another ship while at sea. MSC determined that there are no private sector positions analogous to those involved in underway replenishment.[3] The Union proposals would require MSC to overturn this determination and use the rates set for other private sector jobs as the benchmark for MSC's prevailing rate on underway replenishment.

The Navy rejected proposals one and two as not consistent with the public interest. It views proposal one as a classic case of "featherbedding" and as such not in the public interest.[4] With respect to proposal

---

**2.** In the statement of facts in its brief, FLRA calls this a "collective bargaining agreement." In its brief, the Navy disputes the accuracy of FLRA's designation but admits discussing the practices at issue with the intervenor. Neither the FLRA opinion itself nor the parties' briefs makes any argument based on the subtle distinction between bargaining and discussion. Portions of the agreement, whatever it is called, may well be bargained, others merely imposed. The record is not clear. Since the parties do not draw any legal conclusions from the name of the written understanding, we, like they, will deal with its substance, not its label.

**3.** MSC began using civil service mariners instead of military personnel to replenish underway combat ships in the 1970's. It determined that there was no analogous private sector position for underway replenishment at that time. Jt.App. at 37.

**4.** The Navy has consistently rejected similar proposals as not in the public interest since at least 1965. Jt.App. at 36.

two, the Navy argues it must frequently assign non-specified tasks to its personnel because of the unique situations constantly confronting MSC. Contending proposal two would severely impinge on MSC's ability to assign work to its mariners, the Navy rejected it as not consistent with the public interest.[5]

MSC admits discussing the merits of these five pay practice proposals with the Union but refused to submit them to the full panoply of collective bargaining, contending doing so would negate the Navy's statutory obligation to set pay and pay practices according to the requirements of the prevailing rate system.

After requesting MSC to reply in writing as to whether it would bargain over union proposals relating to pay rates for the non-contract work of civilian mariners, the intervening Union filed a petition with the FLRA for negotiability pursuant to the Labor–Management Statute. 5 U.S.C. § 7117(c). The FLRA, in a divided ruling, held that the Labor–Management Statute required MSC to negotiate over the Union's five proposals. As stated, MSC appeals the FLRA's decision and FLRA cross-petitions for enforcement pursuant to 5 U.S.C. § 7123(a), (b).

## IV.

The prevailing rate system was enacted by Congress in 1972. Its declared purpose was to establish rates of pay in accordance with the public interest, to provide "equal pay for equal work" for agency employees, to maintain rates of pay in line with similar jobs in the private sector, and to attract and retain qualified employees. 5 U.S.C. § 5341 (1982).

Prevailing rate employees include civilian mariners. 5 U.S.C. § 5342(b)(3) (1982). The mariners' wages are exclusively provided for under § 5348:[6]

§ 5348. Crews of vessels

(a) Except as provided by subsections (b) and (c) of this section, the pay of officers and members of crews of vessels excepted from chapter 51 of this title by section 5102(c)(8) of this title shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry.

(b) Vessel employees of the Panama Canal Commission may be paid in accordance with the wage practices of the maritime industry.

(c) Vessel employees in an area where inadequate maritime industry practice exists and vessel employees of the Corps of Engineers shall have their pay fixed and adjusted under the provisions of this subchapter other than this section, as appropriate.

5 U.S.C. § 5348.

Under the prevailing rate system, the Navy has established a procedure for determining the rate of pay for its civilian mariners. MSC is broken into four Area Commands: the European, Far East, Pacific and Atlantic. Only the Pacific and Atlantic Commands operate ships. Each Area Command monitors the prevailing rates and policies of the local private maritime industries. After collecting data on job descriptions and rates and copies of collective bargaining agreements, the Area Command makes recommendations on appropriate rates and positions within its command and forwards them to MSC Headquarters. MSC analyzes the data and de-

---

**5.** The Navy has repeatedly rejected such a proposal, although an analogous policy has existed in the private sector for over thirty years. Jt. App. at 36. Strictly speaking, proposal two does not directly implicate the Navy's power to assign civilian personnel. It does so only indirectly through the economic constraints imposed by the additional pay the proposal requires. Indeed, this is the case with all five proposals. Therefore, we consider only the implications of the prevailing rate system.

**6.** Section 5348 is a continuation of the pay system for mariners which existed in the Classification Act of 1949. The language of the 1949 Act was carried over into § 5348(a) of the prevailing rate system. *See International Org. of Masters v. Brown,* 698 F.2d 536, 540–41 (D.C.Cir. 1983); *Blaha v. United States,* 511 F.2d 1165, 1166, 206 Ct.Cl. 183 (1975).

termines the prevailing rate for its positions. For positions or duties that do not have counterparts in the private sector, MSC extrapolates from available data to arrive at what would be a fair rate for a mariner in the private sector. MSC's recommendations are then forwarded to the Chief of Naval Operations.

The Navy first determines whether the pay rate or practice is in fact the prevailing rate or practice within the private maritime industry. Unlike subsection (b)'s provision governing the Panama Canal Commission, the Navy's inquiry does not end there. The Navy, in § 5348(a), is told to weigh the private sector rate against the public interest in establishing its rates for civilian mariners. In doing so, it considers applicable executive orders, such as inflation-fighting policies, and the effect the rate will have on private industry and overall naval costs. The Navy claims it has discretion to set rates of pay for its public civilian mariners by choosing a balance between countervailing considerations.

If the Navy is correct and the prevailing rate system governs, the intervening Union's remedy is by appeal to the Court of Claims. 28 U.S.C. § 1491 (1982); *see Blaha v. United States*, 511 F.2d 1165, 1166, 206 Ct.Cl. 183 (1975). If the FLRA is correct and the Labor–Management Statute applies, the Union has a remedy before the Federal Service Impasse Panel (Impasse

Panel). 5 U.S.C. § 7119. These remedies are discussed more fully in Part V below.

## V.

The Labor–Management Statute was enacted as Title VII of the Civil Service Reform Act of 1978. Its purpose was to encourage union organization and collective bargaining among federal employees, both of which Congress found to be in the public interest. 5 U.S.C. § 7101. Under this statute, each government employee has the right to join a union and bargain "with respect to conditions of employment." 5 U.S.C. § 7102. "Conditions of employment" are defined as:

(14) ... personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions, except that such term does not include policies, practices, and matters—

(A) relating to political activities prohibited under subchapter III of chapter 73 of this title;

(B) relating to the classification of any position; or

(C) to the extent such matters are specifically provided for by Federal statute[.]

5 U.S.C. § 7103(a)(14). Government agencies have a duty to bargain in good faith over matters of employment,[7] *i.e.*, conditions of employment not excluded from the bargaining process, under 5 U.S.C. § 7117.[8]

---

**7.** 5 U.S.C. § 7103(a)(12) provides:

(12) "collective bargaining" means the performance of the mutual obligation of the representative of an agency and the exclusive representative of employees in an appropriate unit in the agency to meet at reasonable times and to consult and bargain in a good-faith effort to reach agreement with respect to the conditions of employment affecting such employees and to execute, if requested by either party, a written document incorporating any collective bargaining agreement reached, but the obligation referred to in this paragraph does not compel either party to agree to a proposal or to make a concession[.]

**8.** 5 U.S.C. § 7117 provides, in pertinent part:

(a)(1) Subject to paragraph (2) of this subsection, the duty to bargain in good faith shall, to the extent not inconsistent with any Federal law or any Government-wide rule or

regulation, extend to matters which are the subject of any rule or regulation only if the rule or regulation is not a Government-wide rule or regulation.

(2) The duty to bargain in good faith shall, to the extent not inconsistent with Federal law or any Government-wide rule or regulation, extend to matters which are the subject of any agency rule or regulation referred to in paragraph (3) of this subsection only if the Authority has determined under subsection (b) of this section that no compelling need (as determined under regulations prescribed by the Authority) exists for the rule or regulation.

(3) Paragraph (2) of the subsection applies to any rule or regulation issued by any agency or issued by any primary national subdivision of such agency, unless an exclusive representative represents an appropriate unit including not less than a majority of the employees in

The FLRA [9] is empowered to hear disputes over which "matters" are within the duty to bargain [10] under 5 U.S.C. § 7105(a)(2)(E).

Under the Labor–Management Statute, the parties must negotiate over bargainable matters until an impasse is reached. Under 5 U.S.C. § 7119, bargaining impasses are resolved by (1) either party's requesting that the Impasse Panel consider the impasse or (2) all parties agreeing to adopt a procedure approved by the Impasse Panel for binding arbitration of the bargaining impasse. 5 U.S.C. § 7119(b)(1), (2).

## VI.

■ The FLRA first held that § 5348 of the prevailing rate system vests discretion in the Secretary of the Navy to set wages by determining whether a private sector mariner position is sufficiently analogous to a federal civilian mariner position to be adopted and still be consistent with the public interest. *National Maritime Union of America and Department of Navy, Military Sealift Command*, 25 FLRA 105, 107 (1987); Jt.App. at 57, 59. That finding is correct. Based on that finding but relying solely on its own authority, the FLRA held that the five rate issues involved in the case must be bargained because the prevailing rate system gives the Navy discretion. 25 FLRA at 108; Jt. App. at 60. The

Navy did not demonstrate to the FLRA that Congress intended that discretion to be "sole and exclusive." *Id.* Absent a showing that Congress intended an agency's discretion to be "sole and exclusive" over a particular matter, the FLRA will order collective bargaining. The "sole and exclusive discretion" test evolved through the FLRA's interpretation of 5 U.S.C. § 7117(a) in *National Treasury Employees Union, Chapter 6 and Internal Revenue Serv.*, 3 FLRA 748, 759–60 (1980):

> Congress, in enacting the Federal Service Labor–Management Relations Statute, established a requirement that an agency negotiate with the exclusive representative of an appropriate unit of its employees over the[ir] conditions of employment ... except to the extent provided otherwise by law or regulation. That is, to the extent that an agency has discretion with respect to a matter affecting the conditions of employment of its employees, that matter is within the duty to bargain of the agency.

Subsequent FLRA decisions have relied on *National Treasury Employees Union* as authority for this test. *See Overseas Educ. Ass'n, Inc. and Department of Defense, Office of Dependents Schools*, 27 FLRA 492, 494–95 (1987); *National Border Patrol*

---

the issuing agency or primary national subdivision, as the case may be, to whom the rule or regulation is applicable.

(b)(1) In any case of collective bargaining in which an exclusive representative alleges that no compelling need exists for any rule or regulation referred to in subsection (a)(3) of this section which is then in effect and which governs any matter at issue in such collective bargaining, the Authority shall determine under paragraph (2) of this subsection, in accordance with regulations prescribed by the Authority, whether such a compelling need exists.

(2) For the purpose of this section, a compelling need shall be determined not to exist for any rule or regulation only if—

(A) the agency, or primary national subdivision, as the case may be, which issued the rule or regulation informs the Authority in writing that a compelling need for the rule or regulation does not exist; or

(B) the Authority determines that a compelling need for a rule or regulation does not exist.

(3) A hearing may be held, in the discretion of the Authority, before a determination is made under this subsection. If a hearing is held, it shall be expedited to the extent practicable and shall not include the General Counsel as a party.

(4) The agency, or primary national subdivision, as the case may be, which issued the rule or regulation shall be a necessary party at any hearing under this subsection.

5 U.S.C. § 7117(a), (b). If the Navy's pay practices for MSC are considered a "rule or regulation," a remand for an FLRA determination of compelling need under subsection (b) might be appropriate. For the reasons set forth below, we believe bargaining over these proposals would be "inconsistent" with "federal law" under subsection (a)(1). Subsection (b) gives FLRA no power to waive federal law by finding no compelling need for it.

9. The FLRA is created under 5 U.S.C. § 7104 (1982 & Supp. IV 1986).

10. The review process is set out in 5 U.S.C. § 7117(c).

*Council, AFGE and United States Immigration and Naturalization Serv.*, 23 FLRA 106, 109 (1986); *American Fed'n of Gov't Employees, Local 3488 and Federal Deposit Insurance Corp.*, 12 FLRA 532, 533 (1983).[11] FLRA reaches this result by denying a statutory grant of discretion the status of law and equating its exercise with a rule or regulation unless it finds the grant of discretion is "sole and exclusive," a term which has been most narrowly defined. In fact, the parties do not cite any case in which it has been found by FLRA to exist and our own research has uncovered none.[12] Simply put, FLRA asserts that matters within an agency's reviewable discretion, including pay practices, are within the duty to bargain subject to certain narrow statutory exceptions which it reserves unto itself the power to define. None of them, as so defined, would apply here.[13] The Navy asserts that the FLRA places an insurmountable burden on agencies by exempting them from collective bargaining only where a statute explicitly prohibits such bargaining. Given the recent enactment of the Labor–Management Statute, few statutes would include such an explicit exemption. Furthermore, the statute explicitly exempts matters from collective bargaining where to do so would be inconsistent with law (*see* § 7117(a), *supra* note 8) as well as matters specifically provided

for by statute. The Navy's argument has force since the FLRA argues that matters left to agency discretion are, in general, not specifically provided for by statute. The implication of that argument is that sole and exclusive discretion is an empty set.

We need not, however, broadly decide that FLRA's test, properly applied, has no utility in defining the scope of bargaining over agency discretion outside the area of pay and pay practices. As we compare § 5348 of the prevailing rate system to the language of the Labor–Management Statute in the context of its legislative history, we conclude that Congress did not intend to subject the Navy's pay practices with respect to MSC's civilian mariners to collective bargaining.

### VII.

■ After applying its definition of "sole and exclusive" discretion, FLRA also held that "the [union] proposals are not otherwise inconsistent with law, government-wide rule or regulation or any agency regulation for which a compelling need exists" pursuant to the exclusions of § 7117(a). *National Maritime Union of America*, 25 FLRA at 108; Jt.App. at 60. This conclusion involves the statutory interpretation of

**11.** If this case did not involve a conflict between two statutes whose interpretation is entrusted to different agencies, these decisions would be entitled to deference. For the reasons set out above, we need not defer to them here.

**12.** The FLRA's results imply that a matter which Congress has expressly left to agency discretion is not a matter "specifically provided for" by federal statute and therefore exempt from bargaining under 5 U.S.C. § 7103(a)(14)(C). *See* note 13, *infra*. If this conclusion is accepted, the exception FLRA purports to recognize for matters entrusted to an agency's sole and exclusive discretion is unnecessary and the absence of any case applying it to exclude bargaining is explicable.

**13.** The Labor–Management Statute does not require collective bargaining over matters which are the subject of a government-wide rule or regulation for which there is a "compelling need." 5 U.S.C. § 7117(a)(1), (2). *See supra* note 8. Conditions of employment also do not

include "policies, practices, and matters relating to political activities ...; the classification of any position; or ... to the extent such matters are specifically provided for by federal statute." 5 U.S.C. § 7103(a)(14); *see National Treasury Employees Union and Pension Benefit Guar. Corp.*, 9 FLRA 692 (1982) (union proposal concerning wages was not within 5 U.S.C. § 7103(a)(14)(C) definition of "conditions of employment" because agency was subject to wage provisions of 5 U.S.C. §§ 5302, 5332), *aff'd, sub nom. National Treasury Employees Union v. FLRA*, 711 F.2d 420 (D.C.Cir.1983); *American Fed'n of Gov't Employees v. FLRA*, 653 F.2d 669 (D.C.Cir.1981) (affirming FLRA finding that United States Department of Agriculture had no duty to bargain with union over overtime pay rates which were specifically provided for in 5 U.S.C. § 5542(a)). Section 7106 lists certain management rights which are not bargainable. 5 U.S.C. § 7106(a). The President of the United States has the power to exclude certain agencies from all or part of the Act if it is in the interests of national security to do so. 5 U.S.C. § 7103(b).

both the Labor–Management Statute and § 5348 of the prevailing rate system.

In interpreting statutes, we must, of course, give "full effect to the congressional intent, as reflected in the legislation." *New Jersey Air Nat'l Guard*, 677 F.2d at 282. In doing so, we first look to the plain language of these statutes in an effort to fathom whether Congress intended to subject pay practices for civilian mariners to collective bargaining under the Labor–Management Statute. *Barnes v. Cohen*, 749 F.2d 1009, 1013 (3d Cir.1984), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985).

The Labor–Management Statute does not specifically include "pay" or "pay practices" as bargainable matters. Under the statute, agencies must bargain over "conditions of employment," which are defined as "personnel policies, practices and matters ... affecting working conditions." 5 U.S.C. § 7103(a)(14).[14] Conditions of employment are further limited by excluding matters from bargaining "to the extent [they] are specifically provided for by federal statute." 5 U.S.C. § 7103(a)(14)(C).

The FLRA's holding of negotiability in this case depends on the validity of its across-the-board conclusion that matters entrusted to agency discretion are not "specifically provided for by federal statute." Such an interpretation is possible if one looks only to this section of the Labor-Management Statute. However, it ignores § 7117(a) by imputing to Congress an intent to deprive the Navy of the discretion Congress gave it under the prevailing rate system and substitute the collective bargaining process for that discretion. Bargaining "to the extent not inconsistent with

any federal law ... extends to matters which are the subject of any rule or regulation." 5 U.S.C. § 7117(a)(1). This language is repeated in § 7117(a)(2). The plain language of the Labor–Management Statute does not directly answer our question. We note, however, that repeals by implication are not favored. *Rodriguez v. United States*, — U.S. —, 107 S.Ct. 1391, 1392, 94 L.Ed.2d 533 (1987) (per curiam); *Creque v. Luis*, 803 F.2d 92, 95 (3d Cir.1986). We therefore turn to the language of the prevailing rate system.

Section 5348 of the prevailing rate system *commands* the agency to set the pay of civilian mariners: "pay ... *shall* be fixed and adjusted ... as nearly as is consistent with the public interest in accordance with prevailing rates and practices" in the private sector. 5 U.S.C. § 5348(a) (emphasis added). Section 5348 also instructs the administering agency on how to establish pay rates for civilian mariners. The language of § 5348 creates a tension between the "public interest" and "prevailing rates and practices" in the private sector. We are in agreement with the Court of Claims's analysis in *National Maritime Union of America v. United States*, 682 F.2d 944, 231 Ct.Cl. 59 (1982). In deciphering whether § 5348 gives the Navy discretion to determine the public interest in setting mariners' wages, it stated:

"[A]s nearly as is consistent with the public interest" qualifies or limits the main thrust of the sentence, which is "fixed and adjusted from time to time ... in accordance with prevailing rates." We may draw two conclusions from this structure. First, the primary purpose of the statute is to ensure that the pay of these employees will be comparable to

14. We note that the National Labor Relations Act (NLRA) § 158(d) requires employers and union representatives to bargain "with respect to wages, hours and other terms and conditions of employment." 29 U.S.C. § 158(d) (1982). The Labor–Management Statute, although not explicitly based on the NLRA, grants many of the same rights enjoyed in the private sector to public employees. Congress was well aware of the NLRA when it enacted the Labor–Management Statute. *See* H.Rep. No. 95–1403, 95th Cong., 2d Sess. 12 (1978) (House Report), *reprinted in Subcomm. on Postal Personnel and*

*Modernization of the House Comm. on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978*, at 682 (1979) (*Legislative History*); Remarks of Congressman Udall, 124 Cong.Rec. H8462 (daily ed. Aug. 11, 1978); *Legislative History* at 850. Congress's use of only "conditions of employment" implies a narrower range of bargainable matters under the Labor–Management Statute than under the NLRA.

those in the private sector. Second, the public interest is a consideration placed in opposition to equality of pay. The language "as nearly as is consistent with" anticipates that equality of pay may *not* always be entirely consistent with the public interest. These countervailing considerations create a kind of tension in the statute which is crucial to the system, as it provides the administrative discretion needed to operate efficiently a wage system.

*National Maritime Union of America*, 682 F.2d at 949 (footnotes omitted) (emphasis in original). *See also Blaha v. United States*, 511 F.2d 1165, 1170, 206 Ct.Cl. 183 (1975) ("We think the 'public interest' exception was written to provide flexibility needed to eliminate anomalies and inequities that might arise from a too literal conformity to industry practices. It was not written to authorize a complete frustration of the Congressional scheme."). Furthermore, if collective bargaining were required over pay and pay practices for the Navy's civilian mariners, § 5348's provision for variation from private practice would be unnecessary.

We are thus unable to harmonize § 5348 with the collective bargaining mandates of the Labor–Management Statute. We look, therefore, to the legislative history of the Labor-Management Statute to determine if Congress intended to supersede § 5348 and submit pay and pay practices of civilian mariners to collective bargaining.

### VIII.

■ The legislative history of the Labor–Management Statute is silent as to what effect Congress intended collective bargaining to have on agency-determined,[15] as opposed to statutorily determined, pay schemes. The history is replete, however, with indications that Congress did not intend to subject pay of federal employees to bargaining.

The House Report accompanying H.R. 11280, the committee bill, states that "employees, through their unions, [will] be permitted to bargain with agency management throughout the executive branch on most issues, except that federal pay will continue to be set in accordance with the pay provisions of title 5." House Report at 12; *Legislative History* at 682. In the supplemental views accompanying the House Report, committee members stated:

Those of our colleagues who are concerned that this bill will significantly expand the collective bargaining rights of federal employees need not worry. It does not. Enactment of the committee approved labor-management title will continue to deny to Federal employees most of the collective bargaining rights which their counterparts in the private sector have enjoyed for over 40 years. Among the collective bargaining rights not included in the bill are: ... (2) The right to bargain collectively over pay and money-related fringe benefits such as retirement benefits and life and health insurance....

Supplemental Views to H.R. 11280, House Report at 377; *Legislative History* at 721.

The Senate Report accompanying S.2640 voices the Committee on Governmental Affairs' concerns in enacting a labor-management relations statute:

S.2640 incorporates into law the existing federal employee relations program. At the same time, S.2640 recognizes the special requirements of the Federal government and the paramount public interest in the effective conduct of the public's business. It insures to federal agencies the right to manage government operations efficiently and effectively.... The bill permits unions to bargain collectively on personnel policies and practices, and other matters affecting working conditions within the authority of agency managers.... It excludes bargaining on economic matters....

---

15. There are at least 30 federal pay systems which are left to agency determination. President's Panel on Federal Compensation, *Staff Report of the President's Panel on Federal Com-* *pensation* 159–62 (1976); *see also American Fed'n of Gov't Employees, AFL–CIO and Department of the Air Force, Eglin Air Force Base*, 24 FLRA 377, 391 (1986) (Calhoun, Chairman, dissenting).

S.Rep. No. 95–969, 95th Cong., 2d Sess. 12–13 (1978), U.S.Code Cong. & Admin. News, 1978, pp. 2723, 2734–35; *Legislative History* at 749–50.

During debate on the House floor over H.R. 11280, Congressman Clay, a member of the House Committee on Post Office and Civil Service, assured the House that under H.R. 11280 "employees still ... cannot bargain over pay." 124 Cong.Rec. E4293 (daily ed. Aug. 3, 1978); *Legislative History* at 839. Congressman Clay reiterated his beliefs one week later: "I also want to assure my colleagues that there is nothing in this bill which allows federal employees the right to ... negotiate over pay and money-related fringe benefits." 124 Cong.Rec. H466 (daily ed. Aug. 11, 1978); *Legislative History* at 853.

Congressman Ford, another strong supporter of H.R. 11280, stated during debate: "[N]o matters that are governed by statute (such as pay, money-related fringe benefits, retirement and so forth) could be altered by a negotiated agreement." 124 Cong.Rec. H8468 (daily ed. Aug. 11, 1978); *Legislative History* at 855–56. Congressman Udall, whose amended version of H.R. 11280 formed the basis of the version of Title VII enacted into law, stated, "[t]here is not really any argument in this bill or in this title about Federal collective bargaining for wages and fringe benefits and retirement.... All these major regulations about wages and hours and retirement and benefits will continue to be established by law through congressional action." 124 Cong.Rec. H9633 (daily ed. Sept. 13, 1978); *Legislative History* at 923.

The only legislative history which could be read as supporting the FLRA's position is the following comment by Congressman Clay in support of the Udall substitute legislation:

Section 7103(a)(14)(D), removing from subjects of bargaining those matters specifically provided for by Federal statute,

was adopted by the committee and retained in the Udall substitute with the clear understanding that only matters "specifically" provided for by statute would be excluded under this subsection. Thus, where a statute merely vests authority over a particular subject with an agency official with the official given discretion in exercising that authority, the particular subject is not excluded by this subsection from the duty to bargain over conditions of employment.

124 Cong.Rec. H9638 (daily ed. Sept. 13, 1978); *Legislative History* at 933. There is no express reference in this comment to "pay" and its importation into the statement puts Congressman Clay at war with himself over the issue. It contradicts his earlier assurance to the House that pay is not included. *See supra.* Congressman Clay's remarks on agency discretion generally were immediately followed by Congressman Derwinski's specific reiteration that "wages, fringe benefits, and numbers of employees in an agency" remain beyond the scope of collective bargaining. 124 Cong.Rec. H9639 (daily ed. Sept. 13, 1978); *Legislative History* at 935. Senator Sasser echoed the understanding that federal employees could not "bargain over pay or fringe benefits" during Senate floor debates over the proposed legislation. 124 Cong.Rec. S14,281 (daily ed. Aug. 24, 1978); *Legislative History* at 1014.

Considering all of these comments, we cannot read Congressman Clay's comments on § 7103(a)(14)(C) [16] as authorizing collective bargaining over pay and pay practices of federal employees. Neither the language of the Labor–Management Statute nor the legislative history supports such a contention. We do not accept the FLRA's conclusion that matters "specifically" provided for by statute exempts from collective bargaining only those wage rates numerically set out on a pay schedule enacted

**16.** This section was originally § 7103(a)(14)(D) in the Udall substitute version of Title VII. *See* 124 Cong.Rec. H9626 (daily ed. Sept. 13, 1978); *Legislative History* at 909. Section 7103(a)(14)(A) of the Udall version was not in-

cluded in the final enacted version of Title VII. This explains the discrepancy between Congressman Clay's reference to § 7103(a)(14)(D) in his comments and the statute as enacted.

by the Congress. We do not believe that Congress intended such a narrow reading of the statute. Instead, we hold that Congress did not intend to subject the pay of federal employees to collective bargaining under the Labor–Management Statute.

## IX.

Congress's inclusion of a grandfather clause in both the Labor–Management Statute and the prevailing rate system supports this holding. When Congress enacted the prevailing rate system in 1972, it included a clause allowing prevailing rate employees who had historically negotiated over matters regarding "wages, . . . terms and conditions of employment, and other employment matters" to continue to negotiate over those matters. Pub.L. No. 92–392, § 9(b), 86 Stat. 564 (1978) (*reprinted in* 5 U.S.C. § 5343 note (1982)).[17]

The Civil Service Reform Act incorporates a similar savings clause for prevailing rate employees. Pub.L. No. 95–454, § 704, 92 Stat. 1218 (1978).[18] Subsection (a) refers to "terms and conditions of employment and other employment benefits" of prevailing rate employees to whom § 9(b) of the prevailing rate system applies. Subsection (b) refers to the "pay and pay practices" of those prevailing rate employees. If Congress had intended to accord bargaining rights over all discretionary rates when it enacted the Labor–Management Statute in 1978, § 9(b) of the prevailing rate system would have been properly deleted as surplusage.

We recognize that civilian mariners are exempted from all sections of the prevailing rate system except § 5348. 5 U.S.C. § 5342(b)(3). Therefore, § 9(b) and § 704 do not directly apply to them.[19] They do, however, aid us in determining Congress's

---

**17.** Section 9(b) provides:

The amendments made by this Act shall not be construed to—

(1) abrogate, modify, or otherwise affect in any way the provisions of any contract in effect on the date of enactment of this Act [Aug. 19, 1972] pertaining to the wages, the terms and conditions of employment, and other employment benefits, or any of the foregoing matters, for Government prevailing rate employees and resulting from negotiations between Government agencies and organizations of Government employees;

(2) nullify, curtail, or otherwise impair in any way the right of any party to such contract to enter into negotiations after the date of enactment of this Act [Aug. 19, 1972] for the renewal, extension, modification, or improvement of the provisions of such contract or for the replacement of such contract with a new contract; or

(3) nullify, change, or otherwise affect in any way after such date of enactment [Aug. 19, 1972] any agreement, arrangement, or understanding in effect on such date [Aug. 19, 1972] with respect to the various items of subject matter of the negotiations on which any such contract in effect on such date is based or prevent the inclusion of such items of subject matter in connection with the renegotiation of any such contract, or the replacement of such contract with a new contract, after such date.

Pub.L. No. 92–352, § 9(b), 86 Stat. 564 (1972).

**18.** Section 704 provides:

(a) Those terms and conditions of employment and other employment benefits with re-

spect to Government prevailing rate employees to whom section 9(b) of Public Law 92–392 applies which were the subject of negotiation in accordance with prevailing rates and practices prior to August 19, 1972, shall be negotiated on and after the date of the enactment of this Act in accordance with the provisions of section 9(b) of Public Law 92–392 without regard to any provision of chapter 71 of title 5, United States Code (as amended by this title), to the extent that any such provision is inconsistent with this paragraph.

(b) The pay and pay practices relating to employees referred to in paragraph (1) of this subsection shall be negotiated without regard to any provision of—

(A) chapter 71 of title 5, United States Code (as amended by this title), to the extent that any such provision is inconsistent with this paragraph;

(B) subchapter IV of chapter 53 and subchapter V of chapter 55 of title 5, United States Code; or

(C) any rule, regulation, decision, or order relating to rates of pay or pay practices under subchapter IV of chapter 53 or subchapter V of chapter 55 of title 5, United States Code.

Pub.L. No. 95–454, § 704, 92 Stat. 1218 (1978).

**19.** Section 9(b) would not apply to civilian mariners in any event because prior to 1972 they did not bargain over pay and pay practices. *See Amell v. United States*, 384 U.S. 158, 161, 86 S.Ct. 1384, 1386, 16 L.Ed.2d 445 (1966) ("the [mariners] . . . have their wages fixed by federal statutes and regulations, like other federal employees.").

intent on whether pay and pay practices committed in part to agency discretion are "conditions of employment" which constitute "matters" subject to collective bargaining.

Congress would not have included or continued § 9(b) in the prevailing rate system unless a need to explicitly preserve collective bargaining for certain employees existed. The continuing existence of § 9(b) in the prevailing rate law implies that the prevailing rate system does not encompass collective bargaining and strengthens the presumption against implied repeal as does the insertion of § 704 in the Labor–Management Statute.

In addition, the language of the savings clause in § 9(b) of the prevailing rate law distinguishes "wages" and "conditions of employment." Section 704 of the Labor–Management Statute does the same by distinguishing "pay and pay practices" from "conditions of employment." This further indicates to us that Congress did not intend "wages" or "pay and pay practices" to fall within "conditions of employment" as defined in 5 U.S.C. § 7103(a)(14).

## X.

Interpreting the Labor–Management Statute to exclude from bargaining the Navy's pay practices with respect to civilian mariners employed by MSC, as suggested by the above factors, seems to us consistent with congressional policy. Private sector wages encompass the substantive private interests with which the procedures of collective bargaining are concerned. In the 1978 statute, Congress declared that the accommodation of those substantive interests through the procedures of collective bargaining is in the public interest. Another kind of public interest remains in paying the mariners a fair, but not excessive, wage rate. We believe that § 5348, by allowing the Navy discretion to give content to that substantive public policy, subject to court review for its abuse, is better adapted to fixing the pay of civilian mariners than the rough hewn compromises forged in the give and take of collective bargaining. The work of these mariners with the military in supplying our armed forces with the sinews of war is not wholly comparable with that of peacetime mariners.

The Navy, with its special knowledge of the requirements of resupply in emergency or combat, would be deprived of the discretion Congress gave it to carry out the § 5348 balancing scheme if it were required to bargain over pay and pay practices. The Labor–Management Statute requires that parties bargain to impasse. Once impasse is reached, they must choose between binding arbitration or consideration of the impasse by the Federal Service Impasse Panel. 5 U.S.C. § 7119. In either case, a third party has the power to order a binding resolution by compromising the parties' conflicting positions. *Id.* Under such a scheme the Navy could be required to accept proposals which in its discretion it felt were not likely to fit the public interest and would not be subject to reversal on an abuse of discretion standard because of its expertise in anticipating the exigencies and emergencies of military action.

For these reasons, we will grant MSC's petition for review. The FLRA's decision will be set aside, and the FLRA's cross-petition for enforcement will be denied.